FILED

2013 Jul-12  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JAMES HILL, as guardian and next friend of BHJ, a minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 5:10-cv-2593-TMP |
| | ) | |
| MADISON COUNTY SCHOOL BOARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed by the defendants on July 19, 2012.  (Doc. 86).  In that motion, all remaining defendants,[1] the Madison County School Board, Ronnie J. Blair, Jeanne Dunaway, and Teresa G. Terrell, seek judgment in their favor and dismissal of plaintiff's various claims against them under Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681, et seq.), 42 U.S.C. § 1983, and Alabama tort law.  All remaining parties have consented to the exercise of full dispositive jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  *See* Doc. 37.

I.  Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party asking for summary judgment

---

[1]   One defendant, a minor referred to herein as CJC, was dismissed without prejudice by an Order dated January 31, 2012.  (Doc. 62)

"always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.,* 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The evidence supporting a claim must be "substantial," *Marcus v. St. Paul Fire and Marine Ins. Co.*, 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact. *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004); *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249-1250 (11th Cir. 2004). If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination. *See Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have reviewed the facts in the light depicted by the videotape."); *Lewis v. City of West Palm Beach, Fla.,* 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the

jury could reasonably find for the plaintiff.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).    Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  *Anderson*, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

II.  Facts for Summary Judgment Purposes

Applying these standards to the evidence before the court, the following facts are treated as undisputed and taken in a light favorable to the non-moving plaintiff.

At the time of the events giving rise to this action, in January 2010, the minor plaintiff, BHJ, was a 14-year-old female student in the eighth grade at Sparkman Middle School, a school operated by the defendant Madison County School Board.  Defendant Ronnie Blair was the principal of the school, and defendants Jeanne Dunaway and Teresa Terrell were both assistant principals.  Defendant Julie Ann Simpson was a teacher's aide at the school.  Another defendant who was previously dismissed from this action without prejudice was CJC, a 16-year-old male student in the eighth grade at Sparkman.  This case arises out of the events leading up to and including CJC's sexual assault of BHJ in a boys' restroom during school hours on January 22, 2010.

CJC had a troubled academic and disciplinary history at Sparkman.  He came to the attention of Sparkman administrators for disciplinary action at least fourteen times, including at least four instances raising questions about sexual harassment of female students.  As early as

February 4, 2009, CJC was suspended from school for "sexual harassment" involving "making inappropriate comments to a young lady."  During the 2009-2010 school year, before the assault on BHJ, CJC had accumulated the following disciplinary infractions[2]:

      • September 23, 2009 – Defendant Terrell disciplined CJC with three days of suspension for offering a girl money to beat up another girl and stating he would "like to kill her";[3]

      • September 29, 2009 – Defendant Blair disciplined CJC with one day of "in-school suspension" for failure to follow directions while in "AAP"[4];

      • October 16, 2009 – Terrell disciplined CJC with one day of "in-school suspension "for a "verbal altercation" while in AAP;

      • October 23, 2009 – Terrell suspended CJC from the bus for ten days for saying "fuck you" to the bus driver;[5]

      • October 28, 2009 – Terrell disciplined CJC with three days of "in-school suspension" for "inappropriate touching";[6]

---

[2]   The plaintiff argues that the court should draw an adverse inference against the defendants with respect to their knowledge of the full circumstances underlying CJC's disciplinary history. She asserts that the defendants committed spoliation by destroying documentation relating to CJC's disciplinary hearing, even after plaintiff's counsel sent a request to the Board to maintain the certain records and evidence.  The defendants respond, however, that such documentation supporting a student disciplinary action is routinely destroyed by the school system the summer after the school year ends, which, in this case, was the summer of 2010.  Although plaintiff's request to preserve documents and evidence was received by the Board in April 2010, it sought preservation only of videos, documents, and communications "pertaining" to the January 22, 2010, assault.  See Doc. 87-6, p. 28.  The preservation request makes no mention at all of preserving documentation otherwise involving CJC's disciplinary history.  In fact, it does not even mention CJC.  While the Board did preserve all documents and evidence arising out of the January 22, 2010, assault incident (and have produced them discovery), documentation underlying other disciplinary infractions involving CJC were routinely destroyed the following summer after the school year.  Under these circumstances, the court cannot say that defendants negligently or culpably destroyed the documents, and, therefore, spoliation does not apply.

[3]   See Doc. 87-9, pp. 90 and 102 of 138.

[4]   AAP is "Alternative Alternate Placement," a form of in-school suspension ("ISS").

[5]   See Doc. 87-9, pp. 90 and 104 of 138.

[6]   See Doc. 87-9, pp. 90 and 104 of 138.

• October 30, 2009 – Terrell disciplined CJC with one day of "out of school suspension" for disruption and disrespect while in in-school suspension;

• November 18, 2009 – Terrell suspended CJC from riding the bus for 24 days for failing to obey the driver and failing to "keep his hands off of a female student";[7]

• November 25, 2009 – Terrell disciplined CJC with two days of "in-school suspension" for disobedience involving "kissing";[8]

• December 15, 2009 – Principal Blair disciplined CJC with one day of "in-school suspension" for a verbal confrontation with another student;

• December 18, 2009 – Assistant Principal Terrell disciplined CJC with two days of "out of school suspension" for "threats/intimidation" involving threatening another student in AAP with him.[9]

Blair testified that he was aware that, as early as the 2008-2009 school year, CJC had been disciplined for harassment of female students. Included in CJC's disciplinary record produced by the defendants is a copy of a disciplinary report from Ardmore High School (part of the Limestone County school system), dated September 24, 2008, in which CJC was disciplined for "inappropriate public display of affection." A note written with the disciplinary report describes the underlying event as "Touching girls in inappropriate places. Writing inappropriate note to girls asking them to have sex with him." (Doc. 87-9, p. 66 of 138).

Just after the Thanksgiving holiday in 2009, rumors began to circulate that CJC was soliciting girls to meet him to have sex during school hours. The rumors escalated in early January 2010, and defendant Simpson reported the rumors to Principal Blair. He told her that CJC had to be "caught in the act" before disciplinary action could be taken against him. Blair investigated a rumor that CJC was "hooking up" with a female student in the boys' restroom for

---

[7]  See Doc. 87-9, pp. 90 and 105 of 138.

[8]  See Doc. 87-9, pp. 90 and 106 of 138.

[9]  See Doc. 87-9, pp. 90 and 107 of 138.

the purpose of having sex.  Blair interviewed both CJC and the girl alleged to be involved, and both denied the rumor.  He also interviewed other students who reportedly had knowledge of the events, but all stated they only had heard rumors; none had first-hand knowledge.  Even so, Blair informed Terrell and other administrators and faculty to be on a "heightened state of alert" about CJC's activities, and he re-directed a security camera to view down the special-needs hallway.

On January 13, 2010, a female student reported that CJC had touched her inappropriately on the thigh.  Dunaway and Terrell together interviewed the girls who made the report about CJC and another girl, as well as other students who were identified as possibly having knowledge.  (Dunaway, pp. 36-37, 77; Terrell pp. 144-146).  Each witness denied that he or she had seen anything inappropriate between CJC and another student and had no actual knowledge of it.  (Dunaway, pp. 39-40; Terrell, pp. 145-46).  Even so, Terrell and Dunaway placed CJC in in-school suspension for the remainder of that day, pending a meeting with his mother the following morning.  The reason for CJC's placement in AAP was recorded as for "distraction in class" rather than inappropriate touching.  (Terrell, pp. 145, 147-48, 197-98).  Blair and Terrell met with CJC's mother the next morning and decided, with her agreement, that it would be best to place CJC in AAP (in-school suspension) for a period of 20 days.

At the time, Sparkman had a policy or practice of using or allowing AAP students to perform menial work around the school while they were in suspension.  Although AAP ordinarily involved the student performing academic work in a particular classroom all day, rather than changing classes as the rest of the students did, AAP students also could be taken out of the AAP classroom by faculty or staff to perform menial work.  Sometimes AAP students were taken out in groups to pick up paper and other litter on the school grounds.  On January 22, 2010, CJC was taken out of the AAP classroom by a member of the school's custodial staff to

perform "clean up" duties in the hallways of the school.  While doing so, he was not under the direct supervision of any faculty or staff member, but working alone, sweeping the halls.

About two weeks before January 22, CJC began asking BHJ to meet him to have sex.  It began in a physical education class, when CJC approached BHJ and another female student to ask BHJ if she would perform oral sex on him.  BHJ did not respond, but she was aware of the rumors that CJC and another female student were "hooking up" to have sex.  These requests by CJC for sex continued, at least until January 13, when CJC was placed in AAP.[10]  BHJ did not report CJC's requests immediately to school officials, but on January 21, the day before the assault, BHJ reported the requests to defendant Simpson, a teacher's aide working with the physical education classes.  The record does not indicate whether or how Simpson responded.  There is no indication that Simpson counseled BHJ or reported the information to school administrators.  BHJ also reported CJC's requests to her then-guardian, Patricia Jones, who simply told her "don't do it."  There is no indication that Patricia Jones reported the requests to school officials.

On January 22, 2010, CJC was working clean-up duties in the hall while still in AAP.  Near the end of the day, as BHJ was going to her physical education class, CJC approached her again and asked her to meet him in the boys' restroom to have sex.  Again, she ignored him and went on to class.  Shortly after the physical education class began, BHJ approached Simpson and told her that CJC had just asked her again to have sex.  Simpson told her that if she wanted to get CJC in trouble, she should agree to meet with CJC in the restroom so that teachers could catch

_____

[10]   BHJ testified that the requests continued throughout the two-week period, culminating on the assault on January 22.  Although the record is clear that CJC was given 20 days of AAP beginning on January 13, it is also apparent that AAP students frequently were not confined to the AAP classroom, making it at least possible that CJC had access to BHJ during some of the time after January 13.

him "in the act" before anything happened to her.  BHJ initially told Simpson that she did not want to do that, but after thinking about it for 15 or 20 minutes, she went back to Simpson and told her she would do it in order for CJC to be caught and punished.  Simpson then took BHJ to the principal's office to inform someone there of the plan.

Both Simpson and BHJ have testified that they went to the principal's office (which was located just across the hall from the entrance to the gym) and spoke to a "female principal." Simpson has testified that it was Dunaway to whom they spoke,[11] but that Dunaway seemed "disinterested."  She did not stop them or tell them not to go ahead with the plan.

After speaking with Dunaway, Simpson returned to the gym and BHJ went looking for CJC, who was still in the hall.  She told him that she would meet him to have sex, and he told her to go to the sixth-grade boys' restroom and he would follow her there.  BHJ did so, arriving at the restroom just before CJC.  She tried to stall at the water fountain outside the restroom, but CJC just said, "Are you going to do it?"  She replied yes, and went into the restroom.  CJC instructed her to go into the first stall, which was a handicap-accessible stall, making it larger than usual.  She was facing the wall and he instructed her to pull down her pants.  Again she attempted to stall by feigning trouble undoing the button of her jeans, but CJC reached around her, unbuttoned the button and zipper, and pulled down her pants.  Lowering his own pants, CJC attempted to penetrate BHJ, "poking" her five or six times as she told him to stop and that it hurt. CJC then turned her around to face him and demanded that she perform oral sex on him.

While this was occurring over the course of five or six minutes, Simpson was attempting to get staff and faculty to check the restrooms to find them.  Ultimately, two teachers entered the sixth-grade boys' restroom and saw the feet and legs of two people in a stall.  The teachers

---

[11]   Dunaway denies that they spoke to her.

instructed them to come out of the stall.  BHJ was taken aside by a female teacher and CJC was taken aside by a male teacher.  It was reported by the teachers that, although he had pulled up his pants, CJC had a visible erection.  The female teacher asked BHJ if CJC had "touched" her, and she said yes.  She was escorted to the office.  On the way to the office, BHJ was met by Assistant Principal Terrell, who told her, "You'll probably be suspended for this."

BHJ and CJC were put in separate rooms in the principal's office and told to write statements about what happened.  BHJ described the plan to catch CJC and how he raped her in the restroom stall.  CJC denied anything but kissing occurred.  Simpson told Terrell that BHJ should not be in trouble because she (Simpson) told her to go meet CJC in order to "catch him in the act."

Ultimately, the police were called and a rape investigation was begun.  As part of the investigation, BHJ was taken to the Child Advocacy Center, where a rape examination was performed by a registered nurse.  The examination revealed trauma, damage, and bleeding in BHJ's anus.  As a result of the assault, BHJ left Sparkman and transferred to a school in North Carolina, but her grades have suffered and she received counseling for depression.  She stopped participating in extracurricular activities like basketball and singing in the church choir.

At the time of these events, all teachers, teacher's aides, and other employees of the Madison County Board of Education were hired, promoted, retained, terminated, or disciplined by the Board itself, on recommendation from the superintendent.  School principals and assistant principals had no hiring, firing, or employee disciplinary authority beyond making a recommendation to the superintendent.  Training, including sexual harassment training on the Board's policy, was the responsibility of and performed by the Board, not individual schools, principals, or assistant principals.

III.  Discussion

In this action, the plaintiff's First Amended Complaint asserts six claims relevant to the

pending motion for summary judgment,[12] summarized as follows:

> Count I alleges that the "Teacher Defendants"[13] were negligent toward plaintiff
> BHJ by failing to "supervise, discipline, suspend and/or expel defendant [CJC]
> despite their knowledge of his habit and practice of continuously and repeatedly
> making sexual advances to numerous girls . . .";
>
> Count IV alleges that the "Teacher Defendants" recklessly or wantonly "breached
> their duties to B.H.J. by failing to supervise, discipline, suspend and/or expel
> [CJC] despite their knowledge of his habit and practice of continuously and
> repeatedly making sexual advances to numerous girls . . .";
>
> Count V alleges that defendants Blair, Dunaway, and Terrell negligently or
> wantonly hired, retained, or trained defendant Simpson by placing her in a
> position in which she encouraged BHJ to act as bait in an attempt to catch CJC in
> the act of making sexual advances to girls, leading to BHJ's sexual assault;
>
> Count VI alleges a claim for the tort of outrage against the "Teacher
> Defendants"[14];
>
> Count VII alleges a claim under Title IX against the Madison County School
> Board (the "Board") on the basis that the Board was deliberately indifferent to the
> student-on-student sexual harassment being conducted by CJC;
>
> Count VIII alleges a claim under 42 U.S.C. § 1983 against the "Teacher
> Defendants" and the Madison County School Board for denial of plaintiff's
> "Fourteenth Amendment Equal Protection rights by failing to protect her from
> harassment, intimidation and sexual assault and through active participation in a
> [sic] incompetent scheme whereby Plaintiff was left alone and unprotected in a
> bathroom to be used as bait to catch a sexually-aggressive student."

---

[12]   Counts II and III allege claims only against defendant CJC.  As CJC was previously
dismissed as a defendant in this action, the court will not further address these two counts.

[13]  The First Amended Complaint specifically designates the "Teacher Defendants" to include
defendants Blair, Dunaway, Terrell, and Simpson only.  (See First Amended Complaint, ¶ 22).

[14]  The claim also is asserted against CJC, who is no longer a defendant in this action.

The Board, Blair, Dunaway, and Terrell move for summary judgment on all of these claims against them.  Simpson has not moved for summary judgment.  As jurisdiction for adjudication of the state-law claims depends upon the existence of federal jurisdiction, the court will address the federal claims first.

   A.  *Title IX*

   Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a), mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  The Board does not dispute that it was then and is now a recipient to Federal financial assistance, subject to Title IX.  Sexual harassment of students is one form of discrimination on the basis of sex prohibited by Title IX.  See  Davis v. Monroe County Board of Education, 526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).   In Davis, the Supreme Court held that a private damages cause of action could lie against a recipient school board for "student-on-student" sexual harassment under Title IX, but "only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities" and "only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."   Davis v. Monroe County Board of Education, 526 U.S. 629, 633, 119 S. Ct. 1661, 1666, 143 L. Ed. 2d 839 (1999). The funding recipient's conduct or failure to act to end harassment is the key to its liability.  The Board is not responsible for the discriminatory or criminal acts of CJC, but only for its own alleged failure to prevent or end the harassment known to it.

Potential Title IX liability extends only to the funding recipient, the Board in this case. And, it is liable only for its own failures.  A funding recipient is not liable on mere *respondeat superior* grounds.  Referring to its earlier decision in Gebser v. Lago Vista Independent School District, 524 U.S. 274, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998), the Court explained:

> [W]e rejected the use of agency principles to impute liability to the district for the misconduct of its teachers. 524 U.S., at 283, 118 S. Ct. 1989.  Likewise, we declined the invitation to impose liability under what amounted to a negligence standard—holding the district liable for its failure to react to teacher-student harassment of which it knew or *should have* known.  *Ibid.*  Rather, we concluded that the district could be liable for damages only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge.  *Id.,* at 290, 118 S. Ct. 1989. . . .  Liability arose, rather, from "an official decision by the recipient not to remedy the violation." *Gebser v. Lago Vista Independent School Dist., supra,* at 290, 118 S. Ct. 1989.  By employing the "deliberate indifference" theory already used to establish municipal liability under Rev. Stat. § 1979, 42 U.S.C. § 1983, [citations omitted], we concluded in *Gebser* that recipients could be liable in damages only where their own deliberate indifference effectively "cause[d]" the discrimination, 524 U.S., at 291, 118 S. Ct. 1989; . . . .  The high standard imposed in *Gebser* sought to eliminate any "risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." 524 U.S., at 290–291, 118 S. Ct. 1989.

Davis v. Monroe County Board of Education, 526 U.S. 629, 642-643, 119 S. Ct. 1661, 1671, 143 L. Ed. 2d 839 (1999).  A recipient is deliberately indifferent to sexual harassment "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  Davis, 526 U.S. at 648; see also Williams v. Board of Regents of University System of Georgia, 477 F.3d 1282, 1295 (11th Cir. 2007).  Courts are hesitant to second-guess the decisions of school administrators in the area of student discipline and control, unless they are "clearly unreasonable" in response to knowledge of sexual harassment.  Id.  Furthermore, it must be the deliberate indifference of the recipient that is the causation of the

harassment suffered by the victim.  As the Eleventh Circuit has said, "a Title IX recipient may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it."  Williams, at 1295-1296 (some internal quotation marks omitted).

The Eleventh Circuit has described four elements that make up a Title IX action for student-on-student sexual harassment.

> A plaintiff seeking recovery for a violation of Title IX based on student-on-student harassment must prove four elements.  First, the defendant must be a Title IX funding recipient.  *Floyd v. Waiters*, 133 F.3d 786, 789 (11th Cir.), vacated on other grounds, 525 U.S. 802, 119 S. Ct. 33, 142 L. Ed. 2d 25 (1998), reinstated, 171 F.3d 1264 (11th Cir. 1999).  Second, an "appropriate person" must have actual knowledge of the discrimination or harassment the plaintiff alleges occurred.  *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998).  "[A]n 'appropriate person' ... is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination."  *Id.*  Third, a funding recipient is liable for student-on-student harassment only if "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities."  *Davis*, 526 U.S. at 633, 119 S. Ct. 1661.  In considering this element, we analyze the conduct of the funding recipient, not the alleged harasser; we do this to ensure that we hold the funding recipient liable only if the funding recipient's deliberate indifference "subjected" the plaintiff to discrimination. *Id*. at 640–41, 119 S. Ct. 1661. Therefore, we will not hold a funding recipient liable solely because a person affiliated with the funding recipient discriminated against or harassed the plaintiff. *Hawkins v. Sarasota County Sch. Bd*., 322 F.3d 1279, 1284 (11th Cir. 2003). Fourth, the discrimination must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."  *Davis*, 526 U.S. at 633, 119 S. Ct. 1661.

Williams v. Board of Regents of University System of Georgia, 477 F.3d 1282, 1293 (11th Cir. 2007).

In the instant case, it is undisputed that the Board is and was a recipient of Federal financial assistance and is subject to Title IX.  The questions remain whether "an appropriate person" had sufficient notice of CJC's sexual harassment of female students to give the Board actual knowledge of the harassment, whether the Board was deliberately indifferent to such knowledge, whether deliberate indifference by the Board actually caused plaintiff to suffer discriminatory harassment, and whether that harassment was sufficiently severe, pervasive, or objectively offensive as to deny plaintiff access to educational opportunities.

Taking plaintiff's evidence favorably to her, Blair, Dunaway, and Terrell were aware of CJC's troublesome behavior.  He was disciplined by them several times before the assault on plaintiff.  Although some of these disciplinary incidents involved allegations of sexual conduct, the allegations were not so clear or substantiated as to reasonably put the school administrators on notice that CJC was involved in serious or pervasive harassment.  For example, although CJC's school records include a disciplinary notice for "[t]ouching girls in inappropriate places[,] and [w]riting inappropriate note to girls asking them to have sex with him," this occurred at a different school [Ardmore High School] in a different school system before CJC came to Sparkman Middle School.  At Sparkman, in addition to other non-sexual disciplinary infractions, CJC was disciplined in February 2009 for "sexual harassment," involving "making inappropriate comments to a young lady."  There is no other evidence concerning the nature or severity of the actual conduct.  In October 2009, he was disciplined for saying "fuck you" to a bus driver, and later in the month, disciplined again for "inappropriate touching."  In November 2009, he was disciplined again for failing to "keep his hands off of a female student," and then a week later for "disobedience" involving "kissing."  On each of these occasions, it was Assistant Principal

Terrell who imposed the discipline, and the court has no difficulty finding that she was "an appropriate person," but is unconvinced that the information known to her was sufficient to put the Board on notice of actual sexual harassment.

This disciplinary history, even coupled with CJC's infractions not overtly involving sexual harassment of female students, did not give the Board actual knowledge that CJC's behavior constituted sexual harassment so severe that it was depriving female students of educational opportunities.  As another judge on this court has noted, there is "an enormous chasm between the terms 'sexual harassment' and 'sexual misconduct,'" and that Title IX speaks only to the former.  "While sexual misconduct may form the basis of illegal acts, and subject the perpetrator to liability, that does not make such acts into sexual harassment."  Benefield ex rel. Benefield v. Board of Trustees of University of Alabama at Birmingham, 214 F. Supp. 2d 1212, 1220 (N.D. Ala. 2002).  Under Davis, Title IX sexual harassment must rise the level of being so severe, pervasive, and objectively offensive that it acts to deprive students of educational opportunities or benefits based on their sex.  While CJC's disciplinary conduct is disturbing in its constancy, it cannot be said that it met this rigorous standard.  Because school administrators and teachers daily face the raucous behavior of teenagers, not every form of misbehavior, even misbehavior with sexual overtones, gives them actual knowledge of conduct that might require action under Title IX.  Rather, the misconduct must involve harassment that is "serious enough to have the systemic effect of denying the victim equal access to an educational program or activity."  Hawkins v. Sarasota County School Board, 322 F.3d 1279, 1288 (11th Cir. 2003).

Even if this disciplinary history was enough to give the Board actual knowledge of CJC's harassment of female students, the Board was not deliberately indifferent to it.  Time and again, CJC was given various forms of discipline, from in-school suspension to out-of-school

suspension.  While one may debate the adequacy of the Board's disciplinary response to CJC, it cannot be said that it was "clearly unreasonable."  Considering the deference given to school officials for handling student disciplinary problems, the Board was not deliberately indifferent to the harassment by CJC.

Evidence that CJC began soliciting sex from BHJ about two weeks before the assault adds little to the Title IX calculation.  Plaintiff's own evidence is that she did not tell anyone about CJC's comments to her until the day before the assault, when she told Simpson and her guardian, whose only response was to tell BHJ to not have sex with CJC.  Other than Simpson, the teacher's aide in physical education class, no principal or assistant principal at Sparkman had any knowledge that CJC was harassing the plaintiff until only minutes before the assault, when BHJ and Simpson reported it to Dunaway.  The evidence, viewed favorably to plaintiff, establishes that Simpson and plaintiff told Dunaway about the plan to lure CJC into a trap by having BHJ agree to meet him in the boys' restroom to have sex.  Even if it is questionable whether a teacher's aide is an "appropriate person" to put the Board on notice of these facts, there can be little question that Dunaway, as an assistant principal, was.  Being informed of the plan, Dunaway was not informed, however, of sexual harassment by CJC that was so severe, pervasive, and objectively offensive that it denied BHJ equal educational opportunities and benefits in violation of Title IX.  There is no evidence other than that Dunaway understood this to be an isolated event of harassment involving BHJ, insufficient to create any Title IX actual knowledge of severe harassment.  Indeed, as far as Dunaway knew, BHJ agreed to the plan and was participating in it freely in order to catch CJC.  Regardless of how foolish and perhaps even negligent this plan may have been, there never was an intent to subject BHJ to sexual harassment or assault, or even deliberate indifference to her plight.  Taking plaintiff's evidence to be true,

Dunaway and, through her, the Board were not deliberately indifferent to CJC's harassment of BHJ, but were attempting to stop it, notwithstanding how misguided was the attempt to do so.

The court does not downplay the tragic and horrific harm BHJ suffered.  But in order for the Board, as a recipient to Federal funds, to be liable under Title IX, plaintiff must meet the "rigorous"[15] standard laid out by the Supreme Court in Davis.  The plaintiff simply is not able to show that the Board, through "appropriate" personnel, had actual knowledge that CJC's harassment of plaintiff was so severe, pervasive, and objectively offensive as to systemically deprive her of educational opportunities and benefits.  To the extent the Board was actually aware of any sexually-related misconduct by CJC, it was not deliberately indifferent to it, but time and again imposed discipline to control and correct his behavior.  While plaintiff may now second-guess the adequacy of these disciplinary steps, the court is not allowed that luxury. School administrators are given deference with respect to disciplinary decisions unless those decisions are "clearly unreasonable."  The court cannot say that the decisions made with respect to controlling and correcting CJC's misconduct were "clearly" unreasonable.

The Board's motion for summary judgment will be granted with respect to plaintiff's Title IX claim.

### B.  § 1983 Equal Protection/Substantive Due Process Claims

Count VIII of the First Amended Complaint alleges a claim for damages against the Board, Blair, Dunaway, Terrell, and Simpson under 42 U.S.C. § 1983 for violation of the plaintiff's constitutional rights "by failing to protect her from harassment, intimidation and

---

[15]  See Sauls v. Pierce Cnty. Sch. Dist., 399 F.3d 1279, 1284 (11th Cir. 2005)(" The Supreme Court has applied a more rigorous standard when a Title IX plaintiff seeks damages against a school district for student-on-student harassment.").

sexual assault and through active participation in a [sic] incompetent scheme whereby Plaintiff was left alone and unprotected in a bathroom to be used as bait to catch a sexually-aggressive student."   The complaint elaborates further that "the Teacher Defendants and the Madison County School Board, acting or purporting to act under color of state law, intentionally and purposefully discriminated against Plaintiff because of her race and/or sex by depriving her of the rights guaranteed her by the Substantive Due Process and Equal Protection rights found in the Fifth and Fourteenth Amendment to the U.S. Constitution, and her rights under 42 U.S.C. § 1983."   The court reads this as asserting two distinct constitutional violations: (1) discriminatory failure, based on plaintiff's race and/or sex, to protect her from harassment and sexual assault by CJC, and (2) denial of plaintiff's substantive due process right of protection from assault by CJC.   Other than Simpson, who has not moved for summary judgment, the remaining defendants offer various separate arguments for dismissal of this claim.

At the outset, the court recognizes that nothing in Title IX precludes the use of § 1983 as a parallel or alternative basis for attaching liability to an appropriate defendant for sexual harassment in the educational context.  In <u>Fitzgerald v. Barnstable School Commission</u>, 555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009), the Supreme Court held explicitly that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights. Accordingly, we hold that § 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools."   <u>Id.</u>, 555 U.S. at 258, 129 S. Ct. at 797.

Section 1983 provides the following:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To state a claim under § 1983, the plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); see also Wilborn v. Southern Union State Community College, 720 F. Supp. 2d 1274, 1307 (M.D. Ala. 2010). Thus, a key distinction between Title IX and a § 1983 denial of equal educational opportunities is that individual employees of a recipient of federal financial assistance can be sued under § 1983, but not under Title IX. Both the Board and defendants Blair, Dunaway, and Terrell are potentially liable under § 1983 as "persons acting under color of state law."

### (1). Equal Protection and § 1983

Plaintiff's first § 1983 claim is that she was denied equal protection of the laws when, due to her sex and/or race, the defendants allowed CJC to sexually harass and assault her. "The Equal Protection Clause confers a federal constitutional right to be free from sex discrimination. Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 273, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979)." Williams v. Board of Regents of University System of Georgia, 477 F.3d 1282, 1300-1301 (11th Cir. 2007). Sex discrimination is understood ordinarily to include sexual harassment. Clearly, the Equal Protection Clause also confers a constitutional right not be subjected to racial discrimination by a "person" acting under color of state law. To prove claim of racial or sexual discrimination, the plaintiff must establish that he or she suffered adverse treatment different from similarly situated individuals at the hands of someone acting under "color of state" and that

such treatment was purposeful discrimination, motivated by a discriminatory animus against the plaintiff's race or sex.

In response to plaintiff's equal protection claims, the defendant Board and Teacher Defendants Blair, Dunaway, and Terrell deny that they deprived plaintiff of a constitutionally recognized right in that there is no right to be protected from the acts of another person who is not a "state actor."   Also, Blair, Dunaway, and Terrell claim they are shielded by qualified immunity.

Turning first to the Board's potential § 1983 liability, it is clear that liability cannot be predicated merely on *respondeat superior* due to the Board's employment relationship with Blair, Dunaway, Terrell, or Simpson.   There must be some evidence that the constitutional deprivation alleged by the plaintiff was caused by a policy, custom, or practice of the Board.  See Monell v. Department of Social Services of City of New York, 436 U.S. 658, 661, 98 S. Ct. 2018, 2021, 56 L. Ed. 2d 611 (1978).  It is well established that

> [G]overnmental entities. . . cannot be held liable under 42 U.S.C. § 1983 on a theory of respondeat superior. See *Monell*, 436 U.S. at 694, 98 S. Ct. 2018, 56 L.Ed.2d 611.  Instead, such entities may be held liable only for the execution of a governmental policy or custom.  *Id*.; see also *Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989) ("[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue.  Respondeat superior or vicarious liability will not attach under § 1983." (emphasis in original)).

Adcock v. Baca, 157 F. App'x 118, 119-120 (11th Cir. 2005).

In the instant case, there simply is no evidence of any Board policy, custom, or practice that itself resulted in CJC's sexual harassment or assault of BHJ.  It is undisputed that no one representing the Board was aware of CJC's harassment of BHJ until shortly before the assault occurred in the boys' restroom.  Although plaintiff has testified that CJC was making sexual

comments and propositions to her for about two weeks before the assault, she admits that she told no school official or teacher about them until she approached Simpson in gym class the day before the assault.  No action, inaction, policy, or custom by the Board caused or allowed the harassment by CJC to continue, much less that it did so for racially or sexually discriminatory reasons.  Moreover, Simpson's and Dunaway's scheme to use BHJ as "bait" to catch CJC in the act of sexual harassment cannot be attributed to any policy or custom of the Board.  Plaintiff has pointed to no written or unwritten policy endorsed by the Board to use students as "bait" to catch other students in misconduct,[16] and she can point to no other instances of similar conduct approved by the Board from which the court might infer a custom or practice of doing so.  Lacking evidence that the Board's policy, practice, or custom allowed student-on-student harassment, whether racially or sexually based, therefore, plaintiff cannot establish an equal protection violation by the Board, and the Board is entitled to summary judgment on this claim.

Defendants Blair, Dunaway, and Terrell also are entitled to summary judgment on plaintiff's equal protection claim.  First, there is no evidence that Blair and Terrell were aware either of CJC's sexual harassment of BHJ or of the scheme to use plaintiff as "bait" to catch him. They did nothing to deprive plaintiff of equal protection because they were unaware of a need to stop the alleged harassment by CJC and they did not participate in the "sting" operation to catch CJC.  Although Dunaway was also unaware of CJC's harassment of BHJ until shortly before plaintiff was sent to the boys' restroom on a misguided "sting" designed to catch CJC, the evidence favorable to the plaintiff shows that she was aware of Simpson's scheme to catch CJC

---

[16]  Plaintiff argues that Blair interpreted the Board's policy prohibiting sexual harassment to require that students be "caught in the act" before they could be disciplined for harassment. Even if this is true, such an interpretation would not be the Board's policy or practice, but Blair's.  Because <u>Monell</u> prohibits *respondeat superior* liability under § 1983, the Board is not liable for Blair's restrictive interpretation of its policy.

using BHJ as bait and did nothing to stop it.  Nevertheless, the court concludes that she is entitled to qualified immunity from § 1983 liability with respect to her participation in the scheme.

"Qualified immunity protects government officials performing discretionary functions from liability if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'  *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (citation omitted).  The burden rests on the plaintiff to show that qualified immunity is not appropriate. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)."  Snider v. Jefferson State Community College, 344 F.3d 1325, 1327 (11th Cir. 2003). For a constitutional right to be "clearly established" for immunity purposes, the law must be so well established and clear that a reasonable person standing in the shoes of the defendant would be aware that his conduct will contravene the right at the point in time when the conduct occurs.

> Officials are entitled to fair warning from the preexisting law that their alleged acts, at the time the acts occurred, were unconstitutional.  *Hope*, 122 S. Ct. at 2515.  For a constitutional right to be clearly established in a given case, the right's contours must be so clear that every, objectively reasonable official must understand that what the defendant, in the context of the circumstances of the case, is doing clearly violates the right.  See *Vinyard v. Wilson*, 311 F.3d 1340, 1353 (11th Cir. 2002).  That the very act (or something materially similar to it) in question has previously been held unlawful by a court is not always necessary. But in the light of preexisting law, the unlawfulness must be apparent: plain, clear, obvious.  Unless the government official's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity.  See *Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092, 1096–97, 89 L. Ed. 2d 271 (1986).  "When case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state."  *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1032–33 n. 10 (11th Cir.2001)(*en banc*).

Id. at 1328.

There is no question that Dunaway was exercising her discretion as an assistant principal when she acquiesced to the scheme to catch CJC.  Certainly, detection and control of student misconduct is well within the discretionary authority of school officials.  The burden then shifts to the plaintiff to point out authority existing at the time (January 22, 2010) that would give an objectively reasonable school official fair warning that allowing a willing African-American female student to meet with a male student for the purpose of catching him in the act of sexual harassment would deprive the female student of her constitutional right to equal protection. Plaintiff has not done so; she has pointed to no Supreme Court, Eleventh Circuit, or Alabama Supreme Court holdings that are even reasonably close to the facts of this case.  While one might question the wisdom of the scheme proposed by Simpson, there never was an intent that BHJ submit to CJC sexually.   Even under plaintiff's evidence, neither Simpson nor Dunaway expected plaintiff to engage in sex with CJC or that she would be sexually assaulted by him. Rather than acquiescing to CJC's harassment, the scheme was intended -- however misguided -- to put a stop to the harassment.  Thus, this case is unlike even the Tenth Circuit case of Murrell v. School District No. 1, 186 F.3d 1238 (10th Cir. 1999), in which school officials were aware of ongoing sexual harassment and took no steps to stop it.   Here, even this bungled "sting" was intended to put a stop to the harassment.   Rather than purposefully depriving BHJ of equal protection, Dunaway and Simpson foolishly believed they were helping her.   There were no factually similar cases existing in 2010 that would reasonably warn a school official that concocting such a scheme, with a willing student, might violate her constitutional rights.[17]  In the

---

[17]    The court does not express the opinion that Dunaway's and Simpson's acts on January 22, 2010, actually deprived BHJ of any constitutional right, but, rather, that qualified immunity protects them even if a deprivation occurred.

absence of such fair warning, Dunaway is entitled to qualified immunity on plaintiff's constitutional claim.

(2)  Substantive Due Process Claim

Plaintiff also alleges that the Board and the Teacher Defendants (Blair, Dunaway, Terrell, and Simpson) violated her constitutional right to substantive due process by failing to protect her from the harassment and sexual assault of CJC.  Notwithstanding the allegations of the First Amended Complaint, plaintiff's brief in opposition to summary judgment does not address the defendants' argument that substantive due process does not require the defendants to protect a student from the misconduct of a non-state actor, such as another student.  Plaintiff limits her discussion solely to assertion of an equal protection claim.  (See Doc. 94, pp. 37-43).  It appears, therefore, that she has abandoned her substantive due process claim, or, at least, finds nothing to dispute in defendants' discussion of the claim.

In any event, the court agrees with defendants that there is no substantive due process right implicated by the facts involving the Board, Blair, Dunaway, and Terrell.[18]  Even though plaintiff was a student under the charge of the defendants at the time she was sexually assaulted, the Eleventh Circuit has made clear that there is no substantive due process right to expect state officials to protect someone from the misconduct of a non-state actor.  As the Eleventh Circuit has explained:

> The [Supreme] Court has specifically held that the substantive due process component of the Due Process Clause does not require a state to protect its citizens against injury by non-state actors.  *DeShaney v. Winnebago County Dep't of Social Serv.*, 489 U.S. 189, 195, 109 S. Ct. 998, 1003, 103 L. Ed. 2d 249 (1989) ("[N]othing in the language of the Due Process Clause itself requires the State to

---

[18]  As Simpson has not moved for summary judgment, the court has not examined whether such a claim exists against her.

> protect the life, liberty, and property of its citizens against invasion by private
> actors."); accord *Lovins v. Lee*, 53 F.3d 1208, 1209 (11th Cir. 1995) (no general
> substantive due process right to be protected against criminals even when they
> were wrongfully released).

Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1296 (11th Cir. 2005).   Addressing the

concept of substantive due process and the Supreme Court's DeShaney decision in the context of

a student shot accidentally and killed by a gun he himself brought to school, a district court in

Florida has written:

> In *DeShaney*, the Supreme Court announced the now firmly entrenched rule that
> the Due Process Clause of the Fourteenth Amendment does not impose a
> constitutional duty upon a state to protect individuals from private violence.  See
> *DeShaney*, 489 U.S. at 195–97, 109 S. Ct. 998, 103 L.Ed.2d 249.  In that case, the
> Winnebago County Department of Social Services (the County) received
> numerous reports that Joshua, a small child, was being abused by his father. *Id*. at
> 192–93, 109 S. Ct. 998, 103 L.Ed.2d 249.  Joshua, temporarily removed from his
> father's custody, was soon returned to his father's care.  *Id*.  The County
> continued to receive reports that Joshua was being abused by his father but failed
> to act.  *Id*.  Eventually, it was alleged that Joshua's father beat him so severely
> that he suffered permanent brain damage.  *Id*.  Joshua and his mother sued the
> County and several of its employees, alleging that the County had violated the
> Substantive Due Process Clause of the Fourteenth Amendment by failing to
> intervene on Joshua's behalf and protect him from his father's abuse.  *Id*.
>
> The *DeShaney* Court rejected plaintiffs' argument that the County assumed from
> its knowledge of the father's actions.  Relying on the premise that the purpose of
> the Due Process Clause is "to protect the people from the State, not to ensure that
> the State protects them from each other," the Court held that:
>
> > [N]othing in the ... Due Process Clause itself requires the State to
> > protect the life, liberty, and property of its citizens against invasion
> > by private actors. The Clause is phrased as a limitation on the
> > State's power to act, not as a guarantee of certain minimal levels of
> > safety and security. It forbids the State itself to deprive individuals
> > of life, liberty, or property without "due process of law," but its
> > language cannot fairly be extended to impose an affirmative
> > obligation on the State to ensure that those interests do not come to
> > harm through other means.... Consistent with these principles, ...
> > the Due Process Clause[ ] generally confer[s] no affirmative right
> > to governmental aid, even where such aid may be necessary to

> secure life, liberty or property interests of which the government
> may not deprive the individual.

*Id*. at 195–96, 109 S. Ct. 998, 103 L. Ed. 2d 249.

Niziol v. Pasco County District School Board, 240 F. Supp. 2d 1194, 1203-1204 (M.D. Fla. 2002).  The district court noted two recognized exceptions to the DeShaney doctrine: (1) the special-relationship doctrine, and (2) the state-created or enhanced danger doctrine.  Id. at 1204.  The former applies only in custodial situations, where the state has affirmatively limited the plaintiff's ability to protect his own interest.  See Id. at 1204-1205; White v. Lemacks, 183 F.3d 1253, 1257 (11th Cir. 1999).  Mere compulsory school attendance laws do not create such a special custodial relationship.  Id.

The second exception -- the state-created or enhanced danger doctrine -- has a closer fit to the facts of this case.  Under this exception, the state may have a substantive due process obligation to protect a person from harm by a non-state actor where the state itself has *affirmatively* created or enhanced the danger by making the person more vulnerable to the harm.  The Tenth Circuit has explained the exception, saying:

> Many courts have noted that "*DeShaney* ... leaves the door open for liability in
> situations where the state creates a dangerous situation or renders citizens more
> vulnerable to danger."  *Reed*, 986 F.2d at 1125 (citing *DeShaney*, 489 U.S. at 201,
> 109 S. Ct. at 1006); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993).
> This state-created danger doctrine "necessarily involves affirmative conduct on
> the part of the state in placing the plaintiff in danger."  *L.W. v. Grubbs*, 974 F.2d
> 119, 121 (9th Cir. 1992) (citations omitted), cert. denied, 508 U.S. 951, 113 S. Ct.
> 2442, 124 L. Ed. 2d 660 (1993).

Graham v. Independent School District No. I-89, 22 F.3d 991, 995 (10th Cir. 1994).  Mere passive knowledge of a danger or a failure to act in the face of danger is not enough; state actors must create the danger or make it worse by some affirmative act.

In this case, plaintiff's evidence shows that Simpson concocted a scheme and proposed to BHJ that she agree to meet CJC in the boys' restroom where teachers would catch CJC in the act of harassing her.  The scheme was explained to Dunaway, who acquiesced to it,[19] at least to the extent that she did not stop it.  Insofar as Dunaway's acquiescence is concerned, the court finds that this fails to meet the requirement that the state actor *affirmatively* create or enhance the danger BHJ was exposed to.[20]  Dunaway's silence and failure to stop the plan[21] were more akin to a passive failure to protect BHJ with knowledge of the danger she faced, precisely the type of failure to protect DeShaney held did not constitute a violation of substantive due process. Because neither the Board, Blair, Terrell, nor Dunaway created or enhanced the danger to BHJ, the exception does not apply to them, and the holding in DeShaney leaves plaintiff with no substantive due process claim against these four defendants.  They are entitled to summary judgment on this claim.

Without retreading the discussion above, the court also finds that Blair, Terrell, and Dunaway are entitled to qualified immunity with respect to plaintiff's substantive due process claim.  In January 2010 there simply was no pertinent case authority that would give these officials fair warning that a well-intended but foolish scheme to use a willing female student as "bait" to catch a male student in the act of sexual harassment violated the substantive due process

---

[19]   Of course, there is no basis for liability on the part of the Board, Blair, or Terrell, as none of them was aware of the danger to BHJ or the proposed scheme to catch CJC in the restroom. They did not create or enhance the danger to BHJ.

[20]   Again the court has no occasion to consider the application of the exception to Simpson's conduct as she has not moved for summary judgment.

[21]   The evidence on this point comes from Simpson's affidavit, in which she stated that, when the plan was explained to her, Dunaway was "disinterested" and did not try to stop the implementation of the plan.  There is no evidence that Dunaway participated in or actively encouraged the plan to use BHJ to catch CJC.

rights of the female student.  Even if the state-created or enhanced exception applies to the facts of this case, qualified immunity exists to shield Blair, Dunaway, and Terrell because there was no clearly established right of which an objectively reasonable school official would be aware.  Indeed, the DeShaney authority would suggest to school officials the *absence* of such a right.  Again, they are entitled to summary judgment based on their qualified immunity.


### C.  State-Law Claims

Plaintiff also asserts four state-law theories of liability against Blair, Dunaway, and Terrell[22]: negligence; wantonness; negligent/wanton hiring, retention, and training[23]; and outrage.  In moving for summary judgment, the defendants contend that the facts do not support any of these theories and that they are entitled to state-agent immunity.  Because the tort of outrage requires an intentional act, the court will discuss it separately from the negligence/wantonness theories.

### (1)  Negligent/Wanton Hiring, Retention, Training and Supervision

Plaintiff alleges that Blair, Dunaway, and Terrell negligently or wantonly hired, retained, trained, and supervised Simpson, proximately leading to Simpson concocting and proposing to BHJ the scheme to catch CJC by appearing to agree to meet him in the boys' restroom to have

---

[22]   These claims are asserted explicitly against the "Teacher Defendants" only and not the Board itself.  The court assumes the Board is not named as a defendant in these claims as a result of the Alabama Supreme Court's recently holding that local school boards are "state agencies" for purposes of invoking Alabama state constitutional sovereign immunity, at least with respect to state-law tort claims.  See Ex parte Hale County Bd. of Education, 14 So. 3d 844 (Ala. 2009), but see Ex parte Madison County Bd. of Education, 1 So. 3d 980 (Ala. 2008), holding that for purposes of an employment action, a local school board is not an "arm of the state" entitled to claim Eleventh Amendment immunity.  In any event, the Board is not a defendant in these claims.

[23]   Simpson is named as a defendant in these claims as well, except for the claim of negligent/wanton hiring, retention, and training.  She has not moved for summary judgment.

sex.  The First Amended Complaint alleges that Blair, Dunaway, and Terrell owed a duty to the students at Sparkman Middle School to exercise care in the hiring, retention, training, and supervision of teachers at the school, and that they negligently or wantonly "breached their duty. . . in hiring, training, retaining and/or supervising Defendant Simpson when she executed a plan encouraging Plaintiff to place herself in a position where she could be raped and sexually assaulted."  It is important to note that plaintiff does not allege this theory against the Board, which is not named as a defendant in this count of the complaint.  (See Doc. 9, Count V, ¶¶ 71-74).

This claim fails against Blair, Dunaway, and Terrell because they were only Simpson's supervisors, not her employer with authority to make, retain, or supervise the employment relationship.  Only the Board itself could do that.  Under Alabama law, the tort theory of negligent hiring, retention, training, or supervision lies only against the employer of an "incompetent" employee, not the co-employees or even supervisors of the "incompetent" employee.  Alabama law recognizes a cause of action against an employer who negligently hires, retains, trains, or supervises an "incompetent" employee where the incompetence of the employee proximately results in injury to another.  It has been stated this way:

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him.  Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.  It is incumbent on the party charging negligence to show it by proper evidence.  This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.  While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and

incompetency of a certain character are shown on the part of the servant to leave
it to the jury whether they would have come to his knowledge, had he exercised
ordinary care.

Armstrong Business Services v. AmSouth Bank, 817 So. 2d 665, 682 (Ala. 2001) (citations and

internal quotation marks omitted); see also Gardner v. State Farm Mutual Automobile Insurance

Co., 842 So. 2d 1, 9-10 (Ala. Civ. App. 2002).  This statement of the principles underlying a

claim of negligent/wanton hiring, retention, supervision, or training makes clear that the liability

runs to the employer precisely because it is the employer who exercises the authority to hire,

retain, train, or supervise the alleged "incompetent" employee.  It is the employer who has the

authority (and duty) to prevent the harm caused by the "incompetent" employee.

    This reading of Alabama law is supported by the somewhat foggy case of Galactic

Employer Services, Inc. v. McDorman, 880 So. 2d 434 (Ala. Civ. App. 2003).  There, Galactic

sued a director (Clarence McDorman) and an officer (Slate McDorman) of another company,

Matrix, alleging various claims, including that the McDormans negligently hired and supervised

the CEO of Matrix, Zeyad Awwad, who fraudulently represented to Galactic that Matrix would

reimburse Galactic for certain funds advanced by Galactic.  Awwad was later fired by Matrix,

but Matrix still owed the debt to Galactic.  While the majority opinion opaquely discusses the

roles and duties of corporate officers and directors to creditors, it ultimately concluded that

"Clarence [McDorman] and Slate [McDorman] are not liable to Galactic for their alleged

negligence in hiring and supervising Awwad because they owed no duty to Galactic."  Id. at 441.

This rationale for the decision was further expounded upon in Judge Murdock's concurring

opinion, in which he explained:

    Galactic also complains, however, of negligence in the hiring and supervision of
    Awwad.  It is true that our Supreme Court has recognized the torts of negligent

training and negligent supervision -- see, e.g., *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1002-03 (citing *Lane v. Central Bank of Alabama, N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983), and *Thompson v. Havard*, 285 Ala. 718, 723, 235 So. 2d 853 (1970)) -- as well as the tort of negligent hiring -- see, e.g., *CP & B Enters., Inc. v. Mellert*, 762 So. 2d 356, 362 (Ala. 2000) (noting that the jury could have found that the defendant was "negligent in hiring, supervising and retaining" an employee); *Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 278 (Ala.2000) (reversing the dismissal of, among other things, a claim for "negligent hiring, training, and supervision"); and *Floyd v. Macon County Commission*, 707 So.2d 262 (Ala.Civ.App. 1997) (citing *Big B, Inc. v. Cottingham* )).

The real problem for Galactic in attempting to hold Clarence [McDorman] liable in this regard (and, ultimately, Galactic's real problem in attempting to recover in this case), however, is that Clarence was not the party who hired Awwad. The corporation, The Matrix, Inc., hired Awwad. Matrix was the employer; any negligence by the "employer" in hiring and supervising Awwad legally is negligence on the part of the corporation.

Galactic Employer Services, Inc. v. McDorman, 880 So. 2d 434, 445 (Ala. Civ. App. 2003)

(Murdock, J., concurring).  This confirms the basic rule that the torts of negligent or wanton

hiring, retention, training, or supervision of an "incompetent" employee runs only against the

employer, not supervisory co-employees of the "incompetent" employee.[24]

---

[24]   But see Ex parte Bitel, 45 So. 3d 1252 (Ala. 2010).  Of the many reported cases in Alabama dealing with a claim for negligent hiring or supervision, this is the only one in which supervisory co-employees of the alleged "incompetent" employee are named as defendants.  For several reasons, this case is distinguishable from the instant case and does not clearly establish the proposition that supervisory co-employees are liable along with the employer of the "incompetent" employee.

In this case, the mother of a minor female sued the Alabama Department of Public Safety and several supervisory officers of the Department, alleging that a State Trooper, employed by the Department and supervised by the Department's personnel, sexually harassed and assaulted her minor daughter during a traffic stop.  The Department was dismissed from the case due to its status as a state agency.  The supervisory personnel sought dismissal of the claims against them on state-agent immunity grounds, which was denied by the trial court.  The supervisory personnel then sought a writ of mandamus from the Alabama Supreme Court to compel the trial court to grant the dismissal on immunity grounds.  In an opinion by Justice Bolin, the court stressed the limited nature of mandamus relief, which could address only immunity grounds for dismissal.  The court refused to consider, on a petition for writ of mandamus, whether the supervisory personnel simply were not suable for the wrongs of their subordinate.  The court explained:

The nature of the employment relationship also suggests that potential liability for the tort of negligent/wanton hiring, supervision, or training is limited to the employer of the "incompetent" employee.  The employee owes a duty to follow the directions of the employer in carrying out his job responsibilities.  It is the nature of the master-servant relationship that the master controls the manner in which the servant performs the work.  The employer is liable for the negligence of the servant precisely because he retains the authority to direct the work of the servant in a way to avoid causing injury to others.  When an employee is entrusted by the master with supervising the work of subordinate co-employees, his duty to do so runs to the master.  It is his responsibility to supervise other employees as directed by the master.  Imposing a separate and distinct duty to "supervise reasonably," running to other people outside the master-servant relationship, creates the possibility of a conflict of duties between what the master has directed

---

The supervisors also asks [sic] this Court to issue the writ of mandamus because, they say, count VII of the complaint asserts a cause of action based on the doctrine of respondeat superior and, as a matter of law, the doctrine of respondeat superior does not hold supervisors, as co-employees, vicariously liable for the torts of their subordinates.  In making this argument, the supervisors are attempting to address, by mandamus review, an issue other than immunity.  A writ of mandamus is not available to review the denial of a motion to dismiss based on the defense that the plaintiff's claim cannot be premised on a theory of respondeat superior.  *See Ex parte Liberty Nat'l Life Ins. Co.*, 825 So. 2d 758 (Ala. 2002) (holding that the denial of a motion to dismiss or a motion for a summary judgment generally is not reviewable by a petition for a writ of mandamus, subject to certain narrow exceptions such as immunity). Accordingly, we decline to address this issue

Ex parte Bitel, 45 So. 3d 1252, 1259 (Ala. 2010).  The same would be true of the argument that supervisory co-employees of an "incompetent" employee cannot be sued for negligent/wanton supervision and training; the argument simply could not be raised by way of mandamus.  The fact that the Alabama Supreme Court concluded that mandamus was not proper to resolve the state-agent immunity question at such an early stage of the case cannot be read as overruling or raising doubts about the fundamental nature of the tort of negligent/wanton hiring, retention, supervision, or training, which limits its application only to the employer, master, or principal of the "incompetent" employee or agent.

and others claiming a right to the duty, ultimately stripping the master of the right to control the work of his employees. The master might believe that a certain type of training or supervision is best for his employees, but supervisory employees charged with carrying out the training might believe that other or additional training or supervision is "reasonably" necessary if they *personally* are to avoid being sued for the incompetence of the subordinate employee. This conflict of duties undermines the employer's authority in the workplace and the very legal basis on which the employer is held liable for the negligence of his employees – namely, that it is he who controls them. If supervisory personnel do a poor job of training or supervising subordinate employees, they must answer to their employer. If that poor job of training or supervision results in injury to another, it is the employer who must answer for it, not the supervisory co-employees who carried out the training or supervision, for it is the employer who remains responsible for assuring the competence of his employees. For this reason, the tort of negligent hiring, supervision, and training necessarily runs against the employer only, in order to preserve the responsibility of employees to their employers.

Because it is undisputed that defendants Blair, Dunaway, and Terrell were not Simpson's employer, they are entitled to summary judgment with respect to Count V. As they were not Simpson's employer (the Board was), they cannot be held liable to plaintiff for negligently or wantonly hiring, retaining, training, or supervising Simpson.

(2) Negligence/Wantonness

Counts I and IV of the First Amended Complaint allege respectively that the "Teacher Defendants" (Blair, Dunaway, Terrell, and Simpson) negligently or wantonly "breached their duties to B.H.J. by failing to supervise, discipline, suspend and/or expel [CJC] despite their knowledge of his habit and practice of continuously and repeatedly making sexual advances to

numerous girls . . ." and "by engaging in a conspiracy to encourage Plaintiff to place herself in a position where she could be raped and sexually assaulted."  Blair, Dunaway, and Terrell have moved for summary judgment on these claims, arguing that they are entitled to state-agent immunity from damages.[25]

Alabama law recognizes that teachers and employees of local school boards are entitled to state-agent immunity when exercising their discretionary functions associated with educating children.  The Alabama Supreme Court reiterated last year:

> "State-agent immunity protects agents of the State in their exercise of discretion in educating students.  We will not second-guess their decisions."  *Ex parte Blankenship*, 806 So. 2d 1186, 1190 (Ala. 2000). However, "[o]nce it is determined that State-agent immunity applies, State-agent immunity is withheld upon a showing that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority.  [*Ex parte* ] *Cranman*, 792 So. 2d [392,] at 405 [ (Ala. 2000) ]."  *Ex parte Bitel*, 45 So. 3d 1252, 1257–58 (Ala. 2010).

Ex parte Montgomery County Board of Education, 88 So. 3d 837, 843 (Ala. 2012), quoting N.C. v. Caldwell, 77 So. 3d 561, 566 (Ala. 2011).  Local school teachers are within the protections of the immunity as employees of a local school board, which, in turn, is regarded as an agency or arm of the State.  Application of the immunity requires a burden-shifting process, under which the defendant claiming the immunity must establish that she was exercising discretionary functions within the scope of her authority.  If the defendant makes that showing, the burden shifts to the plaintiff to show that the immunity does not apply because the defendant "acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority."  Ex parte Montgomery County Board of Education, 88 So. 3d 837, 843 (Ala. 2012), citing Giambrone v. Douglas, 874 So. 2d 1046, 1052 (Ala. 2003); Ex parte Davis, 721 So. 2d 685, 689 (Ala. 1998).

---

[25]  In these counts, Blair, Dunaway, and Terrell are sued only in their individual capacities.

"'A State agent acts beyond authority and is therefore not immune when he or she "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist."'" Ex parte Estate of Reynolds, 946 So. 2d 450, 452 (Ala. 2006), citing and quoting Giambrone, 874 So.2d at 1052 (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000)).

Insofar as the plaintiff alleges that Blair, Dunaway, and Terrell negligently or wantonly failed to more severely discipline or control CJC before he assaulted BHJ, despite having knowledge that he was sexually harassing female students, state-agent immunity shields them from liability.  It is undisputed that the investigation, assessment, and imposition of student discipline were well within the discretionary functions of these defendants as the principal and assistant principals of Sparkman Middle School.  The burden of showing why the immunity should not apply, therefore, shifts to the plaintiff to show that they "acted willfully, maliciously, fraudulently, in bad faith, or beyond [their] authority."  She has not done so.  While observers may debate whether more should have been done to discipline and control CJC in the weeks and months leading up to his assault of BHJ, one cannot debate that Blair, Dunaway, and Terrell acted in good faith to investigate the complaints made about CJC, imposed reasonable discipline upon him, and otherwise sought to control his behavior.  Even though their multiple investigations often failed to substantiate the complaints against CJC, they did not willfully or maliciously turn a blind eye to them, and they usually imposed some form of discipline on CJC, including both in-school and out-of-school suspension.   There simply is no evidence that they "acted willfully, maliciously, fraudulently, in bad faith, or beyond [their] authority."

The analysis is different, however, with respect to the allegation that they engaged in "a conspiracy to encourage Plaintiff to place herself in a position where she could be raped and sexually assaulted."   As to Blair and Terrell, the evidence continues to be that they were

completely unaware of the plan proposed by Simpson to have the plaintiff meet CJC in order to "catch him in the act" of sexual harassment. Accordingly, there is no basis for holding either of them liable on this theory. The evidence is different for Dunaway, however. Viewing the evidence favorably to the plaintiff, Simpson and BHJ both approached Dunaway in the principal's office to explain the plan proposed by Simpson. Although she appeared "disinterested," she did not stop or discourage them from proceeding with the plan. Even though no one intended for BHJ to submit to CJC sexually or, certainly, to be assaulted by him, she met with CJC in the boys' restroom and, before teachers located them, was sexually assaulted by him. There is little question that Dunaway's failure to intervene and stop the Simpson scheme was either negligent or wanton. The question for immunity purposes is whether she acted willfully, maliciously, fraudulently, in bad faith, or beyond her authority.

The answer to this question is aided considerably by the Alabama Supreme Court's decision in N.C. v. Caldwell, 77 So. 3d 561 (Ala. 2011), reh'g denied (Aug. 12, 2011). In that case, a female student was raped by an older male student in the boys' locker room after a gym class. The plaintiff offered evidence that, after the gym class was dismissed and the teacher, defendant Caldwell, was outside the gym monitoring students, she was dragged into the locker room by the male student and raped. When plaintiff and her guardian sued, Caldwell moved for summary judgment on the basis of his state-agent immunity as a teacher. Plaintiff responded that Caldwell was not entitled to immunity because he "acted beyond his authority" by appointing the male student as his student aide and by ignoring and failing to report other students' complaints of sexual harassment by the male student. Plaintiff pointed out that there was no legal basis for Caldwell to appoint a student to act as his "student aide" and that school regulations prohibited students from being in a class they were not attending. Also, school regulations required

complaints of sexual harassment to be reported to the school principal.  Although Caldwell denied that he had appointed the male student to be his student aide or had authorized him to be in the gym when not participating in a class, and although he denied ever receiving any complaints of sexual harassment related to the male student, the Alabama Supreme Court concluded there were genuine issues of fact precluding summary judgment for Caldwell.  If, the court explained, the jury believed the evidence produced by the plaintiff, it would establish that defendant Caldwell acted beyond his authority and was not entitled to state-agent immunity.

The same result and rationale apply to the instant case.  Although Dunaway denies being informed of the scheme to catch CJC by sending BHJ to meet him, Simpson has testified clearly by affidavit that she and BHJ told Dunaway about the plan and that, although she appeared "disinterested," she did not stop them from proceeding.  Viewing the evidence favorably to the plaintiff, Dunaway, the assistant principal at Sparkman, approved or ratified the plan.  Because the Madison County Board of Education had adopted regulations dealing with sexual harassment complaints by students,[26] it would have been beyond Dunaway's authority to authorize a plan to use a female student as "bait" to trap a male student suspected of sexual harassment.   Because a material fact question exists as to whether Dunaway knew of and approved the plan, therefore, she is not entitled to summary judgment on the basis of state-agent immunity.[27]

---

[26]   See document entitled "Student Sexual Harassment," dated June 1997, attached as Exhibit 5 to Ronnie Blair's deposition.  (Doc. 87-4, pp. 30-31 of 48).  This regulation allowed students to make verbal complaints of harassment to various school officials.  In response to such a complaint, the regulation required the official to whom the complaint was made to make it known to the school principal, who would "investigate the complaint and take appropriate action."   Nothing in the regulation authorized an assistant principal to approve and ratify a "sting" operation to catch a harasser in the act of harassment.  Even if such a plan could be regarded as an "investigation" of a complaint of harassment, no reasonable school official would regard it as "appropriate action."

[27]   The court notes here that Dunaway also argues that she is shielded from liability under the

Moreover, the court has little difficulty concluding that, if plaintiff's evidence is believed by a jury, Dunaway's actions were negligent or even wanton. For a school official to send a 14-year old girl to trick a 16-year old boy into believing she is willing to have sex with him for the purpose trying to catch the boy "in the act" of sexually harassing the girl, and then not carefully and closely monitor the execution of the scheme, is at best negligent and probably recklessly wanton. Gambling with the safety of a student in order to carry out an ill-conceived "sting" operation is not something a reasonable teacher or assistant principal would countenance without paying very careful attention to it.[28] Plaintiff's evidence here suggests that after Simpson and

---

Paul D. Coverdell Teacher Protection Act of 2001, 20 U.S.C. 6731, *et seq.*, which provides in pertinent part as follows:

> [N]o teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if ---
>
> (1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;
>
> (2) the actions of the teacher were carried out in conformity with Federal, State, and local laws **(including rules and regulations)** in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;
>
> * * *
>
> (4) the harm was not caused by willful or criminal misconduct, gross negligence, **reckless conduct**, or a conscious, **flagrant indifference** to the rights and **safety of the individual harmed by the teacher**. [Bolding added for emphasis].

The court has previously concluded that Dunaway failed to follow the "Student Sexual Harassment" regulation adopted by the Madison County Board of Education in June 1997; thus she did not act in conformity with local "rules and regulations" when she and Simpson sent BHJ to meet CJC, rather than report his conduct to the principal as required by the regulation. Also, her conduct was "reckless" and a "flagrant indifference to the . . . safety of" BHJ. The Act does not apply to shield Dunaway from liability.

[28]   The court should note here that there is no fundamental inconsistency between finding that

Dunaway persuaded BHJ to meet with CJC by promising that teachers would "catch" them before anything happened, they essentially abandoned her.  Simpson returned to the gym, and there is no evidence that Dunaway did anything but sit in her office.  They negligently or wantonly failed to protect BHJ from harm by persuading her to meet with CJC and then making little or no effort to protect her while she did so.  The court finds, therefore, that although Blair and Terrell are entitled to summary judgment on plaintiff's claims of negligence and wantonness, Dunaway is not, and her motion for summary judgment on these claims in Count I and IV will be denied.

(3)  <u>Tort of Outrage</u>

Count VI of the First Amended complaint alleges that the "Teacher Defendants" (Blair, Dunaway, Terrell, and Simpson)[29] committed the intentional tort of outrage, also known in Alabama as intentional infliction of emotional distress.  <u>Harrelson v. R.J.</u>, 882 So. 2d 317 (Ala. 2003); <u>Gunter v. Huddle</u>, 724 So. 2d 544 (Ala. Civ. App. 1998); <u>Thomas v. Williams</u>, 21 So. 3d 1234 (Ala. Civ. App. 2008)(outrage and intentional infliction of emotional distress are the same tort).  The count alleges simply that the defendants' conduct (without specifying particular conduct) "was intentional and/or reckless, extreme and outrageous and utterly intolerable in a civilized society."

---

Dunaway engaged in negligent or even wanton conduct by acquiescing to the plan proposed by Simpson and the finding that Dunaway's actions were not enough to meet the "rigorous" requirements of Title IX.  Title IX liability is contingent upon finding severe sexual harassment that systemically deprives the plaintiff of educational opportunities and benefits.  A claim grounded on mere negligence or wantonness can involve injuries quite different (but just as tragic) than the denial of educational opportunities and benefits at the heart of Title IX.  In this case, the injury to BHJ resulting from Dunaway's alleged negligence or wantonness was a sexual assault, not the systemic denial of educational opportunities and benefits required for a claim under Title IX.

[29]  This count also names CJC as a defendant, but he is no longer a defendant in this action.

The elements of the tort, upon which the plaintiff must offer evidence, are the following:

"The tort of outrage requires that: (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) ... the distress was severe. With respect to the conduct element, this Court has stated that the conduct must be 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"

Thomas v. Williams, 21 So. 3d 1234, 1237-1238 (Ala. Civ. App. 2008), quoting Gunter v. Huddle, 724 So. 2d 544, 547 (Ala. Civ. App. 1998)(quoting Harris v. McDavid, 553 So. 2d 567, 569-70 (Ala. 1989)); see also American Road Service Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1980).  Although the court finds that Simpson's and Dunaway's encouragement of BHJ to lead CJC into believing that she would have sex with him in order to catch him "in the act" of sexual harassment was negligent and perhaps wanton, it does not amount to outrage or the intentional infliction of emotional distress.  The plaintiff's evidence does not show that Simpson and Dunaway intended to inflict emotional harm on the plaintiff, nor does it show that *their* conduct was "so extreme in degree as to go beyond all possible bounds of decency."  Also, it was not *their* conduct that caused the plaintiff's emotional injuries.

At the outset, the court draws a distinction between the conduct of Simpson and Dunaway and that of CJC.  It was CJC who knowingly, intentionally, and criminally assaulted BHJ, but neither Simpson nor Dunaway intended, wanted, or expected that would happen.  CJC's conduct was a crime.  Simpson's and Dunaway's conduct was foolishly to send BHJ to meet CJC, not for the purpose of having sex, but for the purpose of catching CJC in the act of sexual harassment.  Analyzing the tort of outrage, the court must look at the specific conduct of

each actor alleged to have committed the tort.  CJC's criminal conduct is not attributable to Simpson and Dunaway; while *his* conduct was unquestionably outrageous, that does not mean necessarily that Simpson's or Dunaway's was.

The plaintiff's evidence clearly shows that neither Simpson nor Dunaway intended to cause BHJ to suffer emotional distress; neither intended for her to have sex with CJC, and certainly neither intended for her to be sexually assaulted by him.  Although they had no intention of causing emotional distress to BHJ, it might be argued that they "knew or should have known that emotional distress was likely to result from [their] conduct."  Again, the court is unpersuaded.  Plaintiff's own evidence shows plainly that neither Simpson nor Dunaway expected that CJC would have an opportunity to harm BHJ before she would be rescued by teachers.  BHJ understood the plan to be that she and CJC would be caught by teachers before any harm could occur.  Thus, at the time they sent her to meet with CJC, they had little reason to believe that it was "likely" that she would suffer emotional distress.[30]

Even if the court were persuaded of the defendants' culpable state of mind, the claim fails for two other reasons: the defendants' conduct was not "extreme and outrageous," nor was *it* the cause of BHJ's emotional distress.   Although it was foolish to send BHJ to meet CJC, the court cannot say that it was "extreme and outrageous."  The scheme to catch CJC ended horribly and tragically, but the idea of using BHJ to catch CJC "in the act," however foolish, was not so extreme or outrageous as "to be regarded as atrocious and utterly intolerable in a civilized society."  Perkins v. Dean, 570 So. 2d 1217, 1219 (Ala. 1990), quoting American Road Service

---

[30]   This element of the tort of outrage is not synonymous with simple negligence.  While Simpson and Dunaway "should have known" that sending BHJ to act as "bait" to catch CJC unnecessarily exposed her to danger (even if they did not anticipate that danger), that does not mean that they should have understood that doing so was "likely" to cause harm.  The use of the term "likely" suggests that the actor in a tort of outrage must anticipate a great probability that *his* conduct (not that of someone else) will cause emotional harm.

Co. v. Inmon, 394 So. 2d 361, 365 (1981)(citing Restatement (Second) of Torts, § 46, comment d (1948)).  "[T]he tort of outrage is 'a limited remedy to be applied only in flagrantly egregious circumstances.'"   Gunter v. Huddle, 724 So. 2d 544, 547 (Ala. Civ. App. 1998), quoting Turner v. Hayes, 719 So.2d 1184, 1187 (Ala.Civ.App.1997), aff'd in pertinent part,719 So.2d 1190 (Ala.1998).  Thus, while conduct might be negligent, or even wanton, it does not necessarily rise to the level of being outrageous because it does not quite possess the egregiousness necessary to say it is "utterly intolerable in a civilized society."  That is the case here.

Second, it was not Simpson's and Dunaway's scheme that *caused* plaintiff's emotional distress; it was CJC's criminal assault.  At the point BHJ was sent to meet CJC, she was a willing participant, clearly not suffering severe emotional distress due to the plan.  The cause of her injuries and distress was CJC's criminality.  Thus, plaintiff is not able to show the third element of the claim – causation – against the "Teacher Defendants."  The motion for summary judgment in favor of Blair, Terrell, and Dunaway will be granted on this claim.  Simpson has not moved for summary judgment.

<u>Conclusion</u>

Based on the foregoing facts viewed favorably to the plaintiff and the legal principles explained, the court will grant full summary judgment to the Madison County Board of Education, Ronnie Blair, and Teresa Terrell, and dismiss with prejudice all claims against them. Jeanne Dunaway's motion will be granted as to every claim against her, except counts I and IV, alleging respectively negligence and wantonness.  There are genuine issues of fact that preclude summary judgment for her on those counts.  Although Julie Simpson has not moved for summary judgment, the court will enter a separate order pursuant to Rule 56(f) of the Federal

Rules of Civil Procedure giving notice and an opportunity for the parties to explain why partial summary judgment should not also be granted to defendant Simpson in the same manner as that granted defendant Dunaway.  A separate order will be entered consistent with this memorandum opinion.

DONE this 12th day of July, 2013.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE