IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JAMES HILL, as Guardian and next friend )
of B.H.J., a minor,                      )
                                         )
              Plaintiff,                  )
                                         )
vs.                                      )        Case No. 5:10-cv-02593-TMP
                                         )
MADISON COUNTY SCHOOL BOARD,              )
et al.,                                  )
                                         )
              Defendants.                 )

## MEMORANDUM OPINION

This action is before the court on a motion for partial summary judgment filed on July 26,

2013, by defendant June Ann Simpson ("Simpson") (doc. 106).  Simpson seeks judgment in her

favor and dismissal of Plaintiff's claims against her under counts VI and VIII.[1]  On August 1, 2013,

Plaintiff responded in a single document (Doc. 108) to Simpson's motion for summary judgment and

to the court's Order Regarding Rule 56(f).  Plaintiff's response opposes the court's proposal to grant

summary judgment to Simpson on counts VI and VIII in congruence with the court's grant of

summary judgment to defendant Jeanne Dunaway on the same claims.   All parties have consented

to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).  Having considered

the pleadings and the evidence and arguments submitted by all parties, the court finds that the motion

for partial summary judgment is due to be granted.

---

[1]  Simpson's motion for summary judgment does not discuss Count I for negligence or Count
IV for wantonness, which also are pending against her.  Therefore, the court will not address those
claims at this time, and the claims will remain pending against Simpson in this action.

## I.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. V. Catrett, 47 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court "shall" grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-252; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983).

However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The evidence supporting a claim must be "substantial," Marcus v. St. Paul Fire and Marine Ins. Co., 651 F.2d 379 (5th Cir., Unit B, 1981); a mere scintilla of evidence is not enough to create a genuine issue of fact.  Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004); Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249-1250 (11th Cir. 2004).  If the non-movant's evidence is so thoroughly discredited by the rest of the record evidence that no *reasonable* jury could accept it, the evidence fails to establish the existence of a genuine issue of fact requiring a jury determination.  See Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such

visible fiction; it should have reviewed the facts in the light depicted by the videotape."); Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1290 n. 3 (11th Cir. 2009). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

The failure to respond to a motion for summary judgment is not enough, in itself, to justify granting summary judgment. Indeed, Rule 56(a) instructs that the court shall grant summary judgment only "*if the movant shows* that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Thus, a court "may neither grant nor deny summary judgment by default." James Wm. Moore et al., Moore's Federal Practice, § 56.99[b] (3d ed. 1997). As noted by the Advisory Committee, "summary judgment cannot be granted by default *even if there is a complete failure to respond to the motion*, much less when an attempted response fails to comply with Rule 56(c) requirements." Fed. R. Civ. P. 56 advisory committee's note (emphasis added). Because "the district court cannot base the entry of summary judgment on the mere fact that it is unopposed, it must consider the merits of the motion." United States v. one Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101-02 (11th Cir. 2004). Utilizing these standards, the court undertakes the analysis of whether the defendant has shown that it is entitled to judgment as a matter of law.

4

## II.    Facts for Summary Judgment Purposes

Applying these standards to the evidence before the court, the following facts are treated as undisputed and taken in a light favorable to the non-moving plaintiff.[2]

At the time of the events giving rise to this action, in January 2010, the minor plaintiff, BHJ, was a 14-year-old female student in the eighth grade at Sparkman Middle School ("Sparkman"). The school is operated by Madison County School Board. Defendant June Ann Simpson was a teacher's aide at the school. Defendant Jeanne Dunaway was an assistant principal. Another defendant who was previously dismissed from this action without prejudice was CJC, a 16-year-old male student in the eighth grade at Sparkman. This case arises out of the events leading up to and including CJC's sexual assault of BHJ in a boys' restroom during school hours on January 22, 2010.

CJC had a troubled academic and disciplinary history at Sparkman. He came to the attention of Sparkman administrators for disciplinary action at least fourteen times, including at least four instances raising questions about sexual harassment of female students. Just after the Thanksgiving holiday in 2009, rumors began to circulate that CJC was soliciting girls to meet him to have sex during school hours. Simpson testifies that she was made aware of the rumors "after the [2009] Christmas break." (Simpson. Aff. ¶ 4.) The rumors escalated in early January 2010, and Simpson reported the rumors to Principal Blair, who told her that CJC had to be "caught in the act" before disciplinary action could be taken against him. Principal Blair investigated a rumor that CJC was "hooking up" with a female student in the boys' restroom for the purpose of having sex, but both

---

[2]    Because Simpson's Motion for Summary Judgment fails to provide a statement of undisputed facts or incorporate any specific facts, affidavits, or depositions from the record, the court will establish undisputed facts from the record and from June Ann Simpson's Affidavit (Doc. 93-1), which was provided in support of Plaintiff's response to the motion for summary judgment filed by Teresa Terrell, Jeanne Dunaway, Ronnie Blair, and the Madison County School Board.

students involved denied the rumor and no other student had first-hand knowledge.  Even so, Blair informed Assistant Principal Terrell and other administrators and faculty to be on a "heightened state of alert" about CJC's activities, and he re-directed a security camera to view down the special-needs hallway.

On January 13, 2010, a female student reported that CJC had touched her inappropriately on the thigh.  Defendant Assistant Principals Dunaway and Terrell interviewed the girl who made the report and also interviewed other students who were identified as possibly having knowledge of the event.  (Dunaway, pp. 36-37, 77; Terrell pp. 144-46).  Each witness denied that he or she had seen anything inappropriate between CJC and another student and had no actual knowledge of the incident.  (Dunaway, pp. 39-40; Terrell, pp. 145-146).  As a precautionary measure, Terrell and Dunaway placed CJC in in-school suspension ("AAP") for the remainder of that day, pending a meeting with his mother the following morning.  The reason for CJC's placement in AAP was recorded as "distraction in class" rather than inappropriate touching.  (Terrell, pp. 145, 147-148, 197-198).  Blair and Terrell met with CJC's mother the next morning and decided, with her agreement, that it would be best to place CJC in AAP for a period of 20 days.

At the time, Sparkman had a policy or practice of using or allowing AAP students to perform menial work around the school while they were in suspension.  Although AAP ordinarily involved the student performing academic work in a particular classroom all day rather than changing classes as the rest of the students did, AAP students also could be taken out of the AAP classroom by faculty or staff to perform menial work.  Sometimes AAP students were taken out in groups to pick up paper and other litter on the school grounds.  On January 22, 2010, CJC was taken out of the AAP classroom by a member of the school's custodial staff to perform "clean up" duties in the hallways

of the school.  While doing so, he was not under the direct supervision of any faculty or staff member, but working alone, sweeping the halls.

About two weeks before January 22, CJC began asking BHJ to meet him to have sex.  It began in a physical education class, when CJC approached BHJ and another female student to ask BHJ if she would perform oral sex on him.  BHJ did not respond, but she was aware of the rumors that CJC and another female student were "hooking up" to have sex.  These requests by CJC continued, at least until January 13, when CJC was placed in AAP.[3]  BHJ did not report CJC's requests immediately to school officials, but on January 21, the day before the assault, BHJ reported the requests to Simpson, a teacher's aide working with the physical education classes.[4]  The record does not indicate whether or how Simpson responded.  There is no indication that Simpson counseled BHJ or reported the information to school administrators.  BHJ also reported CJC's requests to her then-guardian, Patricia Jones, who simply told her "don't do it."  There is no indication that Patricia Jones reported the requests to school officials.

On January 22, 2010, CJC was working clean-up duties in the hall while still in AAP.  Near the end of the day, as BHJ was going to her physical education class, CJC approached her again and asked her to meet him in the boys' restroom to have sex.  Again, she ignored him and went to class.  Shortly after the physical education class began, BHJ approached Simpson and told her that CJC had

---

[3]  BHJ testified that the requests continued throughout the two-week period, culminating in the assault on January 22.  Although the record is clear that CJC was given 20 days of AAP beginning on January 13, it also is apparent that AAP students frequently were not confined to the AAP classroom, making it at least possible that CJC had access to BHJ during some of the time after January 13.

[4]  Simpson's affidavit does not mention of BHJ approaching her on January 21 (only on January 22), but Simpson's motion for summary judgment does not dispute the fact; therefore, it will be treated as undisputed for the purposes of this motion.

just asked her again to have sex.  Simpson suggested that BHJ agree to meet with CJC in the restroom so that teachers could catch him "in the act" before anything happened to BHJ.  (Simpson Aff. ¶ 5).  BHJ initially told Simpson that she "[did not] like that kid" and did not want to do that, but after thinking about it for 15 or 20 minutes, she went back to Simpson and told her she would do it in order for CJC to be caught and punished.  Simpson then took BHJ to the principal's office to inform someone there of the plan.

Both Simpson and BHJ have testified that they went to the principal's office (which was located just across the hall from the entrance to the gym) and spoke to a "female principal." Simpson has testified that it was Dunaway to whom they spoke,[5]  but that Dunaway seemed "disinterested."  She did not stop them or tell them not to go ahead with the plan.

After speaking with Dunaway, Simpson "thought someone else was handling the situation," and returned to the gym.  (Simpson Aff. ¶ 8).  BHJ went looking for CJC, who was still in the hall. When BHJ found CJC, she told him that she would meet him to have sex, and he told her to go to the sixth-grade boys' restroom and he would follow her there.  BHJ did so, arriving at the restroom just before CJC.  She tried to stall at the water fountain outside the restroom, but CJC said, "Are you going to do it?"  She replied, "yes," and went into the restroom.  CJC instructed her to go into the first stall, which was a handicap-accessible stall, making it larger than usual.  She was facing the wall and CJC instructed her to pull down her pants.  Again, she attempted to stall by feigning trouble undoing the button of her jeans, but CJC reached around her, unbuttoned the button and unzipped the zipper, and pulled down her pants.  Lowering his own pants, CJC attempted to penetrate BHJ,

---

[5]  Dunaway denies that they spoke to her.

8

"poking" her five or six times as she told him to stop and that it hurt. CJC then turned BHJ around to face him and demanded that she perform oral sex on him.

While this was occurring over the course of five or six minutes, Simpson was attempting to get staff and faculty to check the restrooms to find them. Ultimately, two teachers entered the sixth-grade boys' restroom and saw the feet and legs of two people in a stall. The teachers instructed them to come out of the stall. BHJ was then taken aside by a female teacher and CJC was taken aside by a male teacher. It was reported by the teachers that, although he had pulled up his pants, CJC had a visible erection. The female teacher asked BHJ if CJC had "touched" her, and she said yes. She was escorted to the office.[6] On the way to the office, BHJ was met by Assistant Principal Terrell, who told her, "You'll probably be suspended for this."

BHJ and CJC were put in separate rooms in the principal's office and told to write statements about what happened. BHJ described the plan to catch CJC and how he raped her in the restroom stall. CJC denied anything but kissing occurred. Simpson told Terrell that BHJ should not be in trouble because she (Simpson) told BHJ to go meet CJC in order to "catch him in the act."

Ultimately, the police were called and a rape investigation was begun. As part of the investigation, BHJ was taken to the Child Advocacy Center, where a rape examination was performed by a registered nurse. The examination revealed trauma, damage, and bleeding in BHJ's anus. As a result of the assault, BHJ left Sparkman and transferred to a school in North Carolina,

---

[6] Simpson testifies that when she didn't see BHJ in the gym, she went to the locker room and found her crying, and that other students were with BHJ. Simpson states that the other students told her that BHJ was raped. Simpson claims that at that point she hugged BHJ and escorted her into the office. (Simpson Aff. ¶ 14). Although the facts on record differ, they are not "material" for the purposes of Simpson's motion for summary judgment.

but her grades have suffered, and she received counseling for depression.  She stopped participating in extracurricular activities like basketball and singing in the church choir.

At the time of these events, all teachers, teacher's aides, and other employees of the Madison County Board of Education ("Board") were hired, promoted, retained, terminated, or disciplined by the Board itself, on recommendation from the superintendent.  Training, including sexual harassment training on the Board's policy, was the responsibility of and performed by the Board, not individual schools, principals, or assistant principals.  Simpson testifies that she received no proper training in how to handle student conduct issues or complaints of sexual harassment and that, due to her lack of training, she suggested the course of action taken by BHJ in order to catch CJC in the act. (Simpson Aff. ¶¶ 17-18).

## III.     Discussion

In this action, Plaintiff's First Amended Complaint asserts two claims relevant to the pending motion for partial summary judgment,[7] summarized as follows:

Count VI alleges a claim for the tort of outrage[8] against the "Teacher Defendants"[9];

---

[7]     Simpson did not file for summary judgment as to Counts I and IV, alleging negligence and wantonness. Counts II and III allege claims only against CJC.  As CJC was previously dismissed as a defendant in this action, the court will not further address these two counts. Count V is alleged only against Blair, Dunaway, and Terrell, who have previously been dismissed on summary judgment. Count VII is alleged only against the Madison County School Board, which also has been dismissed on summary judgment.

[8]     This claim is also asserted against CJC, who is no longer a defendant in this action.

[9]     The First Amended Complaint specifically designates the "Teacher Defendants" to include defendants Blair, Dunaway, Terrell, and Simpson only. (See First Amended Complaint ¶ 22).

> Count VIII alleges a claim under 42 U.S.C. § 1983 against the "Teacher Defendants"
> and the Madison County School Board for denial of Plaintiff's "Fourteenth
> Amendment Equal Protection rights by failing to protect her from harassment,
> intimidation, and sexual assault and through active participation in a [sic]
> incompetent scheme whereby Plaintiff was left alone and unprotected in a bathroom
> to be used as bait to catch a sexually-aggressive student."

Simpson moves for summary judgment on Counts VI and VIII. Because Simpson did not move for summary judgment on Counts I and IV, those claims remain pending against her. As jurisdiction for adjudication of the state-law claims depends upon the existence of federal jurisdiction, the court will address the federal claim first.

### A. 42 U.S.C. § 1983 Equal Protection/Substantive Due Process Claims

Count VIII of the First Amended Complaint alleges a claim for damages against Simpson under 42 U.S.C. § 1983 for violation of Plaintiff's constitutional rights "by failing to protect her from harassment, intimidation and sexual assault and through the active participation in a [sic] incompetent scheme whereby Plaintiff was left alone and unprotected in a bathroom to be used as bait to catch a sexually-aggressive student." The complaint elaborates further that "the Teacher Defendants and the Madison County School Board, acting or purporting to act under color of state law, intentionally and purposefully discriminated against Plaintiff because of her race and/or sex by depriving her of the rights guaranteed her by the Substantive Due Process and Equal Protection rights found in the Fifth and Fourteenth Amendment to the U.S. Constitution, and her rights under 42 U.S.C. § 1983." The court reads this as asserting two distinct constitutional violations: (1) discriminatory failure, based on Plaintiff's race and/or sex, to protect her from harassment and sexual assault by CJC, and (2) denial of Plaintiff's substantive due process right of protection from assault by CJC. Simpson asserts that Plaintiff's claims under 42 U.S.C. § 1983 fail to state a claim

upon which relief can be granted and, in the alternative, that Simpson is entitled to qualified immunity from all claims against her under 42 U.S.C. § 1983.

At the outset, the court recognizes that nothing in Title IX precludes the use of § 1983 as a parallel or alternative basis for attaching liability to an appropriate defendant for sexual harassment in the educational context.  In Fitzgerald v. Barnstable School Commission, the Supreme Court held explicitly that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights.  555 U.S. 246, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009) Accordingly, we hold that § 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools."  Id., 555 U.S. at 258, 129 S. Ct. At 797.

Section 1983 provides the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To state a claim under § 1983, the plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); see also Wilborn v. Southern Union State Community College, 720 F. Supp. 2d 1274, 1307 (M.D. Ala. 2010).  Thus, a key distinction between Title IX and a § 1983 denial of equal educational opportunities is that individual employees of a recipient of federal

financial assistance can be sued under § 1983, but not under Title IX. Defendant Simpson is potentially liable under § 1983 as a "person acting under color of state law."

(1) Equal Protection and § 1983

Plaintiff's first § 1983 claim is that she was denied equal protection of the laws when, due to her sex and/or race, Simpson acted as the mastermind of a "sting" operation that used BHJ as "bait" to catch a sexually aggressive student. "The Equal Protection Clause confers a federal constitutional right to be free from sex discrimination." Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 273, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979). Williams v. Board of Regents of University System of Georgia, 477 F.3d 1282, 1300-1301 (11th Cir. 2007). Sex discrimination is understood ordinarily to include sexual harassment. Clearly, the Equal Protection Clause also confers a constitutional right not be subjected to racial discrimination by a "person" acting under color of state law. To prove a claim of racial or sexual discrimination, the plaintiff must establish that she suffered adverse treatment different from similarly situated individuals at the hands of someone acting under "color of state" and that such treatment was purposeful discrimination, motivated by a discriminatory animus against the plaintiff's race or sex.

Simpson denies that she deprived BHJ of a constitutionally recognized right and argues that she was "without the authority to do so" due to her position as a teacher's aide. Further, Simpson argues that she did not have a duty to protect BHJ from the acts of third parties. Simpson contends that there is no evidence that she treated BHJ any differently than any other student or that she acted with indifference toward BHJ. Finally, Simpson argues that she is entitled to qualified immunity from all claims against her under § 1983. The court concludes that Simpson is entitled to qualified immunity from § 1983 liability with respect to her participation in the scheme.

13

"Qualified immunity protects government officials performing discretionary functions from liability if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Snider v. Jefferson State Community College, 344 F.3d 1325, 1327 (11th Cir. 2003) (citing Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 2512, 153 L. Ed. 2d 666 (2002) (citation omitted)).   Simpson has the burden of proving that she was performing a discretionary function at the time of the incident in question.  Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003).  If Simpson meets that burden, the burden is then shifted to Plaintiff to show that qualified immunity is not appropriate because Simpson's conduct violated a clearly established right held by BHJ, of which a reasonable person would have been aware.  Snider, 344 F.3d at 1327.

The first question is whether Simpson was performing a discretionary function when she suggested that BHJ act as "bait" so that Simpson or other teachers or administrators could catch CJC "in the act" and punish him.  When determining whether a governmental actor was performing a discretionary function, the Eleventh Circuit has instructed that "[i]nstead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).   To determine whether Simpson's actions fell within her job responsibilities, we must analyze her actions under a two pronged test: (1) was Simpson "pursuing a job-related goal," and (2) was she using "means that were within h[er] power to utilize." Id. at 1265.  Simpson's actions clearly satisfy the first prong of this test.  Her goal was to promote discipline and punish a student who was violating school policy by behaving in a sexually aggressive manner.  As a teacher's aide, this is clearly one of the specific tasks Simpson was authorized to do.

14

In determining whether Simpson acted within her authority, it is important that the court "look to the general nature of the defendant's action." Id. at 1266. As the Eleventh Circuit explained, "In considering whether an act of allegedly excessive force fell within a police officer's duties ... we do not ask whether police have the right to use *excessive* force. ... We instead ask whether they have the power to attempt to effectuate arrests." Id. at 1266 (citing Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)). In terms of the instant case, the proper question would be "does a teacher's aide have the right to attempt to stop students from sexually harassing one another?" The answer is yes. Despite the disastrous results of this misguided "sting" operation, Simpson's intent was to put a stop to the harassment. Because Simpson was acting within her discretionary function, the burden is now on Plaintiff to prove that Simpson is not entitled to qualified immunity.

"Once a defendant establishes that [s]he was acting within h[er] discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity" because her actions violated one of BHJ's clearly established rights. Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003). In Saucier v. Katz, the United States Supreme Court outlined a two step process for determining when qualified immunity is inappropriate. 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed. 2d 272 (2001). The process required that the court first ask whether "the facts alleged show the officer's conduct violated a constitutional right," and only then ask "whether the right was clearly established." Saucier, 533 at 201. However, in Pearson v. Callahan, the Court reconsidered the Saucier method and determined that the sequence "should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. 223, 236, 129

S. Ct. 808 (2009).  In light of the facts in this case, the court will analyze the second prong first, and determine whether a clearly established right existed.

For a constitutional right to be "clearly established" for immunity purposes, the law must be so well established and clear that a reasonable person standing in the shoes of the defendant would be aware that his conduct will contravene the right at the point in time when the conduct occurs.

Officials are entitled to fair warning from the preexisting law that their alleged acts, at the time the acts occurred, were unconstitutional.  *Hope*, 122 S.Ct. at 2515.  For a constitutional right to be clearly established in a given case, the right's contours must be so clear that every, objectively reasonable official must understand that what the defendant, in the context of the circumstances of the case, is doing clearly violates the right.  See *Vinyard v. Wilson*, 311 F.3d 1340, 1353 (11th Cir. 2002).  That the very act (or something materially similar to it) in question has previously been held unlawful by a court is not always necessary.  But in the light of preexisting law, the unlawfulness must be apparent: plain, clear, obvious.  Unless the government official's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity.  See *Malley v. Briggs*, 475 U.S. 335, 106 S. Ct. 1092, 1096-97, 89 L.Ed. 2d 271 (1986).  "When case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state."  *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1032-33 n. 10 (11th Cir. 2001)(*en banc*).

Snider, 344 F.3d at 1328.

To show that one of BHJ's well-established rights was violated, Plaintiff must point out authority existing at the time (January 22, 2010) that would give an objectively reasonable teacher's aide fair warning that allowing a *willing* female student to meet with a male student for the purpose of catching him in the act of sexual harassment would deprive the female student of her constitutional right to equal protection.  Plaintiff has not done so; she has pointed to no Supreme

Court, Eleventh Circuit, or Alabama Supreme Court holdings that are even reasonably close to the facts of this case.  While BHJ has a clearly established right to be free from sex discrimination (including sexual harassment),[10] Simpson's actions did not directly deprive BHJ of that right, nor were they intended to do so.  Although the wisdom of the plan is clearly suspect, there was never an intent that BHJ submit to CJC sexually.  Even under Plaintiff's evidence, Simpson did not expect Plaintiff to engage in sex with CJC or that she would be sexually assaulted by him.  The scheme – however misguided – was intended to put a stop to the harassment.  Thus, this case is unlike even the Tenth Circuit case of Murrell v. School District No. 1, in which school officials were aware of ongoing sexual harassment and took no steps to stop it.  186 F.3d 1238 (10th Cir. 1999)  Here, even this bungled "sting" was intended to put a stop to the harassment.  Rather than purposefully depriving BHJ of equal protection, or even acquiescing to the violation of her equal protection rights, Simpson foolishly believed she was helping BHJ.  There was no factually similar case existing in 2010 that would reasonably warn a school official that concocting such a scheme, with a willing student, might violate her constitutional rights.[11]  In the absence of such fair warning, there is no need to circle back to the first prong of the Saucier analysis, and Simpson is entitled to qualified immunity on Plaintiff's constitutional claim.

––––––––––––––––––

[10] Personnel Admin'r of Mass. v. Feeney, 442 U.S. 256, 273, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979); Williams v. Bd. of Regents of Univ. System of Ga, 477 F.3d 1282, 1300-1301 (11th Cir. 2007).

[11] The court does not express the opinion that Simpson's acts on January 22, 2010, actually deprived BHJ of any constitutional right, but, rather, that qualified immunity protects Simpson even if a deprivation occurred.

(2)  <u>Substantive Due Process Claim</u>

Plaintiff also alleges that Simpson violated her constitutional right to substantive due process by failing to protect her from harassment and sexual assault by CJC.  Simpson argues in her motion for summary judgment that she had no duty to protect BHJ from the acts of third parties who are not government actors (in this case, CJC) and, that she is entitled to qualified immunity.  Plaintiff argues in her opposition to summary judgment that Simpson's actions amount to deliberate indifference and thereby subject Simpson to liability.  Although Simpson is right that there is generally no duty on government actors to provide protection from third-party actors, there are exceptions to this general rule, and Simpson's actions may fall under one.  Whether or not Simpson's actions constitute deliberate indifference, there is a colorable argument that Simpson's actions actually created the danger that resulted in the sexual assault of BHJ.  If so, Simpson's actions may fall into an exception to qualified immunity.

The Supreme Court of the United States held in <u>DeShaney v. Winnebago County Department of Social Services</u> that:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. ... Consistent with these principles, ... the Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government may not deprive the individual.

489 U.S. 189, 195, 109 S. Ct. 998, 1003, 103 L. Ed. 249 (1989).

The Eleventh Circuit continues to follow the DeShaney doctrine, and adopts it as a general rule.  See Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1296 (11th Cir. 2005).  However, while addressing the concept of substantive due process and the Supreme Court's DeShaney decision, the district court in the Middle District of Florida noted two recognized exceptions to the DeShaney doctrine: (1) the special relationship doctrine, and (2) the state-created or enhanced danger doctrine.  Niziol v. Pasco County District School Board, 240 F. Supp. 2d 1194, 1204.  The former applies only in custodial situations, where the state has affirmatively limited the plaintiff's ability to protect his own interest.  See id. at 1204-1205; White v. Lemacks, 183 F.3d 1253, 1257 (11th Cir. 1999).  Mere compulsory school attendance laws do not create such a special custodial relationship. Id.

The second exception – the state-created or enhanced danger doctrine – has a closer fit to the facts of this case.  Under this exception, the state may have a substantive due process obligation to protect a person from harm by a non-state actor where the state itself has *affirmatively* created or enhanced the danger by making the person more vulnerable to the harm.  The Tenth Circuit has explained the exception, saying:

> Many courts have noted that "*DeShaney* ... leaves the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger." *Reed*, 986 F.2d at 1125 (citing *DeShaney*, 489 U.S. at 201, 109 S. Ct. at 1006); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993). This state-created danger doctrine "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (citations omitted), cert. denied, 508 U.S. 951, 113 S. Ct. 2442, 124 L. Ed. 2d 660 (1993).

Graham v. Independent School District No. I-89, 22 F.3d 991, 995 (10th Cir. 1994).  Mere passive knowledge of a danger or failure to act in the face of danger is not enough; state actors must create the danger or make it worse by some affirmative act.

In this case, Plaintiff's evidence and Simpson's own testimony show that Simpson concocted a scheme and proposed to BHJ that she agree to meet CJC in the boys' restroom where teachers would catch CJC in the act of harassing BHJ.  Simpson's actions constitute more than a failure to protect, and this is not the type of behavior that the DeShaney doctrine shields.  However, without retreading the discussion above, Simpson is entitled to qualified immunity with respect to Plaintiff's substantive due process claim because in January 2010, there simply was no pertinent case authority that was analogous enough to the instant case to give Simpson fair warning that a well-intended but foolish scheme to use a willing female student as "bait" to catch a male student in the act of sexual harassment violated the substantive due process rights of the female student.  Even if the state-created or enhanced danger exception to DeShaney applies to the facts of this case, qualified immunity exists to shield Simpson.

In sum, Simpson is entitled to qualified immunity with respect to Plaintiff's § 1983 claim against her.  Accordingly, Simpson will be granted summary judgment on this claim.


*B.  State Law Claim: Tort of Outrage*

Count VI of the First Amended complaint alleges that the "Teacher Defendants" (Blair, Dunaway, Terrell, and Simpson)[12] committed the intentional tort of outrage, also known in Alabama as intentional infliction of emotional distress.  Harrelson v. R.J., 882 So. 2d 317 (Ala. 2003); Gunter

---

[12]  This count also names CJC as a defendant, but he is no longer a defendant in this action.

20

v. Huddle, 724 So. 2d 544 (Ala. Civ. App. 1988); Thomas v. Williams, 21 So. 3d 1234 (Ala. Civ.

App. 2008)(outrage and intentional infliction of emotional distress are the same tort).  The count

alleges simply that Defendants' conduct (without specifying particular conduct) "was intentional

and/or reckless, extreme and outrageous and utterly intolerable in a civilized society."

> The elements of the tort, upon which the plaintiff must offer evidence, are the
> following:
>
> "The tort of outrage requires that: (1) the actor intended to inflict emotional distress,
> or knew or should have known that emotional distress was likely to result from his
> conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions
> caused the plaintiff distress; and (4) ... the distress was sever.  With respect to the
> conduct element, this Court has stated that the conduct must be 'so outrageous in
> character and so extreme in degree as to go beyond all possible bounds of decency,
> and to be regarded as atrocious and utterly intolerable in a civilized society.'"

Thomas v. Williams, 21 So. 3d 1234, 1237-38 (Ala. Civ. App. 2008), quoting Gunter v. Huddle, 724

So. 2d 544, 547 (Ala. Civ. App. 1988)(quoting Harris v. McDavid, 553 So. 2d 567, 569-70 (Ala.

1989)); see also American Road Service Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1980).

Although the court finds that Simpson's encouragement of BHJ to lead CJC into believing

that she would have sex with him in order to catch him "in the act" of sexual harassment was

negligent and perhaps wanton, it does not amount to outrage or the intentional infliction of emotional

distress.  Plaintiff's evidence does not show that Simpson intended to inflict emotional harm on BHJ,

nor does it show that *her* conduct was "so extreme in degree as to go beyond all possible bounds of

decency."  Also, it was not *her* conduct that caused BHJ's emotional injuries.

At the outset, the court draws a distinction between Simpson's conduct and that of CJC.  It

was CJC who knowingly, intentionally, and criminally assaulted BHJ, but Simpson did not want,

expect, or intend for it to happen.  CJC's conduct was a crime.  Simpson foolishly sent BHJ to meet

CJC, not for the purpose of having sex, but for the purpose of catching CJC in the act of sexual harassment.  Analyzing the tort of outrage, the court must look at the specific conduct of each actor alleged to have committed the tort.  CJC's criminal conduct is not attributable to Simpson; while *his* conduct was unquestionably outrageous, that does not mean that Simpson's necessarily was.

Plaintiff's evidence clearly shows that Simpson did not intend to cause BHJ to suffer emotional distress; she did not intend for BHJ to have sex with CJC, and certainly did not intend for BHJ to be sexually assaulted by him.  Although Simpson had no *intention* of causing emotional distress to BHJ, it might be argued that Simpson "knew or should have known that emotional distress was likely to result from [her] conduct."  Again, the court is unpersuaded.  Plaintiff's own evidence shows plainly that Simpson did not expect that CJC would have an opportunity to harm BHJ before she would be rescued by teachers.  BHJ understood the plan to be that she and CJC would be caught by teachers before any harm could occur.  Thus, at the time they sent her to meet with CJC, they had little reason to believe that it was "likely" that she would suffer emotional distress.[13]

Even if the court were persuaded of the Simpson's culpable state of mind, the claim fails for two other reasons: Simpson's conduct was not "extreme and outrageous," nor was *it* the cause of BHJ's emotional distress.   Although it was foolish to send BHJ to meet CJC, the court cannot say that it was "extreme and outrageous."  The scheme to catch CJC ended horribly and tragically, but

---

[13]   This element of the tort of outrage is not synonymous with simple negligence.  While Simpson "should have known" that sending BHJ to act as "bait" to catch CJC unnecessarily exposed her to danger (even if they did not anticipate that danger), that does not mean that she should have understood that doing so was "likely" to cause harm.  The use of the term "likely" suggests that the actor in a tort of outrage must anticipate a great probability that *her* conduct (not someone else's) will cause emotional harm.

the idea of using BHJ to catch CJC "in the act," however foolish, was not so extreme or outrageous as "to be regarded as atrocious and utterly intolerable in a civilized society." Perkins v. Dean, 570 So. 2d 1217, 1219 (Ala. 1990), quoting American Road Service Co. v. Inmon, 394 So. 2d 361, 365 (1981)(citing Restatement (Second) of Torts, § 46, comment d (1948)). "[T]he tort of outrage is 'a limited remedy to be applied only in flagrantly egregious circumstances.'" Gunter v. Huddle, 724 So. 2d 544, 547 (Ala. Civ. App. 1988)(quoting Turner v. Hayes, 719 So.2d 1184, 1187 (Ala. Civ. App. 1997)), aff'd in pertinent part, 719 So. 2d 1190 (Ala. 1998). Thus, while conduct might be negligent, or even wanton, it may not rise to the level of being outrageous because it does not possess the egregiousness necessary to say it is "utterly intolerable in a civilized society." That is the case here.

Second, it was not Simpson's scheme that *caused* Plaintiff's emotional distress; it was CJC's criminal assault. At the point BHJ was sent to meet CJC, she was a willing participant, not suffering severe emotional distress due to the plan. The cause of her injuries and distress was CJC's criminality. Thus, Plaintiff is not able to show the third element of the claim – causation – against Simpson. The motion for summary judgment in favor of Simpson will be granted on this claim.

Conclusion

Based on the foregoing facts viewed favorably to Plaintiff and the legal principles explained, the court will grant summary judgment on claims VI and VIII in favor of defendant June Ann Simpson. Because Simpson has not filed for summary judgment on Counts I and IV, alleging respectively negligence and wantonness, those claims still are pending against her. A separate order will be entered consistent with this memorandum opinion.

DONE this 24th day of October, 2013.


T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE